# United States Court of Appeals
## For the First Circuit

No. 17-1607

AXIA NETMEDIA CORPORATION,

Plaintiff, Appellant,

v.

MASSACHUSETTS TECHNOLOGY PARK CORPORATION,
d/b/a Massachusetts Technology Collaborative,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch, Circuit Judge,
Souter, Associate Justice,[*]
and Kayatta, Circuit Judge.

Brian P. Voke, with whom Adam A. Larson and Campbell Campbell Edwards & Conroy PC were on brief, for appellant.
Robert J. Kaler, with whom Edwin L. Hall and Holland & Knight LLP were on brief, for appellee.

April 25, 2018

[*]   Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**KAYATTA**, <u>Circuit Judge</u>.  This appeal arises out of the efforts of the Massachusetts Technology Park Corporation ("MTC") to provide broadband network access in western and north central Massachusetts.  An independent public instrumentality of the Commonwealth of Massachusetts, MTC entered into two contracts relevant to this appeal.  Under one contract, Axia NGNetworks U.S.A., which later changed its name to KCST, Inc. ("KCST"), agreed to operate the network that MTC would build.  Under a second contract, KCST's parent company, Axia NetMedia Corporation ("Axia"), guaranteed KCST's performance.  With the network now constructed and operating, MTC on the one hand and KCST and Axia on the other hand have lodged claims against each other, and KCST has filed for bankruptcy.  By the parties' agreement, those claims will be resolved, perhaps in the coming months, by arbitration. In the meantime, MTC secured from the United States District Court a preliminary injunction ordering Axia, as guarantor of KCST, to perform various obligations of KCST while the parties' substantive disputes remain unresolved.  Axia appeals and, for the following reasons, we affirm on all but one narrow issue, for which we remand.

## I.

We begin with the contract between MTC and KCST pursuant to which MTC agreed to build and KCST agreed to operate the new

network.  We call this contract the "NOA" (for "network operator agreement").

Under the NOA, KCST agreed to be "responsible for all aspects of the management, sales, monitoring, operations, support, and maintenance of the MTC network."  KCST also agreed to pay all costs of operating the network and an annual oversight fee to MTC. In return, KCST retained the network's revenue up to a defined threshold, above which it agreed to share the revenue with MTC.

Article 11 of the NOA calls for binding arbitration of any disputes that the parties are unable to resolve on their own. Key to this appeal is the final provision of this article.  Titled "Continued Performance," Article 11.2 states:

> The Parties agree to continue performing their respective obligations under the Agreement (including the Wholesale Customer contracts and SLAs) while the dispute is being resolved unless and until such obligations are terminated or expire in accordance with the provisions of this Agreement, or unless otherwise directed by MTC.

On February 25, 2011, the same day that KCST and MTC inked the NOA, Axia and MTC entered into an agreement under which Axia guaranteed KCST's obligations in the NOA (we call this contract the "Guaranty").  In the Guaranty, Axia promised that, "should Network Operator default in any of its payment or performance obligations under the Network Operator Agreement," then Axia would "make all such payments and perform all such

- 3 -

obligations of the Network Operator," and "fully and punctually pay and discharge, as the same become due and payable, any and all costs, expenses and liabilities for or in connection with the Guaranteed Obligations." That promise, though, is limited: "This guaranty is limited to and capped at the amount of Four Million ($4,000,000) US Dollars, and should Guarantor advance to MTC funds up to said amount, Guarantor shall have no further obligation or liability under this Agreement."

The Guaranty also addresses dispute resolution. Under the heading "Governing Law, Jurisdiction, Venue and Forum," the Guaranty allows MTC, at its sole election, to file a demand for arbitration to resolve any dispute that the parties fail to resolve through mediation. The Guaranty contains no express statement about what, if anything, Axia must do pending the resolution of any dispute. It does, though, state: "All other provisions relating to dispute resolution or arbitration contained in the Network Operator Agreement are herein incorporated by reference."

MTC and KCST's relationship soured by the time MTC began turning over the network to KCST in late 2013. KCST claimed that the network MTC delivered was not the one it had been promised. KCST's specific grievance was that the number of "Community Anchor Institutions," dubbed "CAIs," that had been built was too small. CAIs are facilities such as schools and municipal buildings that, according to Axia, are directly connected to the network, serve as

- 4 -

hubs of connectivity for extending the network to other customers, and are critical to the network's financial viability (and thus to KCST's net revenues). As the dispute sharpened in July of 2014, KCST notified MTC that, pending the resolution of the dispute, KCST would be "withholding all fees and payments to or on behalf of MTC." This notification led MTC to obtain an injunction from a Massachusetts state court requiring KCST, in accord with the NOA's continued performance provision, to continue performing its obligations (including making payments) during the dispute. During the following two years, the dispute simmered, but neither party pushed it toward resolution by arbitration.

In 2016, a Swiss investment firm acquired a controlling position in Axia. Because the Federal Communications Commission had granted authorization to KCST to operate the network, and this authorization could not be transferred without FCC approval, KCST's operation of the network, as a wholly-owned subsidiary of Axia, apparently would have added a hurdle to the acquisition's regulatory approval. Therefore, to facilitate the acquisition, Axia transferred the stock of KCST into a trust. The FCC approved this transaction. MTC, which had not participated in the FCC proceeding, filed for reconsideration, which the FCC denied.

According to MTC, KCST then made a number of changes to the website KCST maintained for the broadband network. Claiming the website changes to be a breach of the NOA's continued

- 5 -

performance provision, MTC went to Massachusetts state court to enforce the previously issued preliminary injunction. The next day, KCST declared bankruptcy. Under section 362(a) of the Bankruptcy Code, the filing of Chapter 11 bankruptcy stayed MTC's state court action. See 11 U.S.C. § 362(a).

KCST apparently continued to perform what it viewed as its operational obligations, but ceased to make many of the payments that it was obligated to make under the NOA. Anticipating a claim against it as guarantor, Axia preemptively filed suit in federal district court, seeking a declaratory judgment that MTC had materially breached the NOA by failing to build sufficient CAIs, and that, because of that breach, Axia had no responsibility under the Guaranty. We will refer to this disagreement between MTC and Axia as "the underlying dispute." MTC has since successfully demanded arbitration of the underlying dispute, to be held in the coming months. MTC also filed in this lawsuit commenced by Axia a motion for a temporary restraining order and preliminary injunction requiring Axia as guarantor to perform KCST's obligations under the NOA while the arbitration of the underlying dispute is pending. We will call this disagreement and its ancillary issues the "continued performance dispute."

After conducting evidentiary hearings and hearing argument concerning the continued performance dispute, the district court issued a preliminary injunction. In its order

- 6 -

implementing the preliminary injunction, the district court imposed a series of requirements on Axia. It required Axia both to pay KCST's unmet payment obligations and to continue to provide, through Axia's affiliates, the "same level" of services to the network that those affiliates were currently providing. The order also required Axia to provide assistance in transferring the services provided by Axia's affiliates to a new network operator, should MTC so request. As part of this transfer assistance, the order required Axia to provide to MTC all information concerning the broadband network in Axia's control. Axia opposed issuance of the order, and now asks that we set it aside in toto.

## II.

The district court employed the familiar four-factor test for a preliminary injunction, analyzing the likelihood of success on the merits, the presence of irreparable harm absent relief, the balance of the equities, and the public interest. See Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015). Although we review the district court's decision to grant a preliminary injunction for abuse of discretion, we review its findings of fact for clear error and its conclusions of law de novo. See OfficeMax, Inc. v. Levesque, 658 F.3d 94, 97 (1st Cir. 2011).

## A.

### 1.

Axia's lead argument on appeal is that the district court focused on the wrong dispute in assessing the likelihood of success on the merits. In evaluating this first prong of the test for preliminary injunctive relief, the district court trained its focus on whether MTC was likely to succeed in its argument that the Guaranty imposed an obligation on Axia to continue performing during the dispute resolution process. In other words, the court assessed the likely outcome of the continued performance dispute. Axia contends that the district court should have instead determined whether MTC was likely to succeed in the parties' underlying dispute about whether MTC's alleged breaches of the NOA freed Axia of any obligations under the Guaranty.

Axia's argument misapprehends the substance of the contractual undertaking that MTC seeks to enforce. MTC alleges that Axia promised to continue performance under the Guaranty even while a dispute exists as to whether MTC has breached the NOA. In the face of such a claim, MTC's success does not hinge on establishing that it will prevail in the underlying dispute. Rather, to succeed, it need prevail in establishing that Axia bound itself to perform pendente lite. The district court therefore quite properly focused its likelihood of success analysis upon the likelihood that MTC would succeed in the continued performance

- 8 -

dispute, i.e., on its claim that Axia must perform until the underlying dispute is resolved, however it might be resolved. See Guinness-Harp Corp. v. Jos. Schlitz Brewing Co., 613 F.2d 468, 471 n.1 (2d Cir. 1980) (noting the "adverse consequences [that] would occur" should, "for the purpose of assessing probable success on the merits, the merits were incorrectly considered to be the ultimate issue of contract termination," when that issue was subject to arbitration (internal citation omitted)); see also Peabody Coalsales Co. v. Tampa Elec. Co., 36 F.3d 46, 47-48 (8th Cir. 1994) (granting injunctive relief pending the resolution of a dispute in arbitration based on a similar contractual provision). To conclude otherwise would be to turn a promise to perform while a dispute is pending into a lesser promise, specifically, one to perform while a dispute is pending only if the promisor is likely to lose the dispute. And in this case, it would require the district court to opine on the merits of a dispute that will be decided by an arbitrator.

Of course, one can imagine a case in which the line between deciding whether a party has promised to perform and deciding the merits of the parties' underlying dispute might not be so sharp. When a court orders a party to perform, it must define "performance." In so doing, it might run into a dispute about what performance is. In this very case, for example, we address, infra, whether performance by Axia includes making

expenditures in excess of $4 million. As we will explain, we accept Axia's argument that any order to spend in excess of that amount does indeed need to be justified (and is not) by an analysis of the underlying merits of the parties' positions on that issue. But that issue is ancillary to the merits of the parties' pending arbitration and, as became clear at oral argument, the parties do not dispute the meaning of the $4 million cap. We therefore need not -- and do not -- decide how a court asked to enforce a promise to perform pending arbitration should proceed in assessing the likelihood of success on the merits if presented with a material dispute concerning what performance in ordinary course entails. Rather, we conclude more narrowly that, on the record in this case, the district court did not err by training its likelihood of success analysis on the question of whether Axia promised to continue performance until the arbitrator resolves the dispute.

In so concluding, we do not overlook Axia's argument that we must assess the merits of the underlying dispute because Axia seeks rescission as a result of MTC's alleged breaches. Axia's reasoning seems to be that if its rescission claim is likely to prevail, then it is relieved of all its promises -- including any promise to perform pendente lite. In rejecting this argument, we rely on the case law rejecting identical arguments aimed at avoiding promises to arbitrate. In brief, this case law recognizes that even claims for rescission based on fraud do not nullify an

- 10 -

agreement to arbitrate unless the arbitration agreement itself (rather than the contract as a whole) was procured by fraud. See Farnsworth v. Towboat Nantucket Sound, Inc., 790 F.3d 90, 96 (1st Cir. 2015) (citing, among other cases, Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 402-04 (1967)); see also Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 71 (2010) ("[E]ven where . . . the alleged fraud that induced the whole contract equally induced the agreement to arbitrate[,] . . . we nonetheless require the basis of the challenge to be directed specifically to the agreement to arbitrate before the court will intervene."); Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 383 (1st Cir. 2011) (affirming the district court's decision to compel arbitration because, "[a]lthough Appellants have challenged the validity of the [agreement] as a whole, they have not specifically challenged the validity of the Arbitration Clause itself"). In this contract, the promise to perform while arbitration proceeds qualifies easily as a term of the agreement that describes the manner in which the parties' dispute will proceed to arbitration. See Peabody Coalsales Co., 36 F.3d at 48 (citing the Federal Arbitration Act's requirement that a court order the parties "to proceed to arbitration in accordance with the terms of the agreement," 9 U.S.C. § 4). So, since there is no claim by Axia that its dispute resolution promise was itself obtained by fraud

- 11 -

or is otherwise invalid, the fact that Axia will ask the arbitrator to rescind the Guaranty is of no moment in this particular case.

**2.**

Having thus confirmed that the district court trained its "likelihood of success" assessment on the proper question, we turn next to the merits of that question. But before doing so, we must address a threshold issue relevant to our review.

Although the injunction in this case is styled as "preliminary," once arbitration is completed, any possible need to compel performance pendente lite disappears. For that reason, some appellate courts review such preliminary injunctions as either permanent injunctions or orders for specific performance. See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430, 433-34 (2d Cir. 1993); Guinness-Harp Corp., 613 F.2d at 471. This can matter in some cases because a preliminary injunction rests on the reasonableness of a prediction concerning the final outcome while a permanent injunction, or order granting a request for specific performance, rests on the correctness of the final outcome.

Nevertheless, in this particular case we need not decide whether the order should be treated as a permanent injunction. For one, no party raises or challenges the district court's decision to proceed with the motion as a request for a preliminary injunction. More importantly, as we will explain, in this case

- 12 -

the pivotal question is a question of law, i.e., how to interpret a written contract concerning which neither party relies on any relevant extrinsic evidence.  See OfficeMax, Inc., 658 F.3d at 97. We decide that question of law de novo, even in reviewing a preliminary injunction.  Id.  So, in short, our answer would not differ depending on whether we treat the injunction as preliminary or final.

We therefore turn our attention to that question of law: Does the Guaranty require Axia to perform its obligations as guarantor while the underlying dispute is being resolved?  The last sentence of the Guaranty incorporates by reference "[a]ll other provisions relating to dispute resolution or arbitration contained in the Network Operator Agreement."  As we have noted, the NOA does indeed contain an article titled "Dispute Resolution." Article 11.1.1 states:  "Any dispute between the Parties either with respect to the interpretation of any provision of the Agreement or with respect to the performance by Network Operator or by MTC hereunder shall be resolved as specified in this Article 11 . . . ."  Article 11.2 then clearly states that the "Parties agree to continue performing their respective obligations under the Agreement . . . while the dispute is being resolved." So, a straightforward incorporation of Article 11.2 into the Guaranty would seemingly mean that the "Parties" to the Guaranty (i.e., MTC and Axia) "agree to continue performing."

Axia nevertheless argues that Article 11.2 of the NOA only imposes a continued performance obligation on the "Network Operator," and because Axia is not operating the network, incorporation of Article 11.2 does not impose any such obligation on Axia.  This argument makes no sense.  Article 11.2 imposes a continuing obligation requirement on the "Parties."  In other words, like every other provision in the NOA (or in pretty much any contract), it imposes obligations on the parties to that contract.  By incorporating that provision of the NOA into the Guaranty, the drafters of the Guaranty effectively adopted the provision as their own, at which point the "Parties" would obviously mean the parties to the Guaranty.  For example, suppose the NOA stated that "the parties will keep any dispute confidential," and the Guaranty said it incorporated this confidentiality clause.  As incorporated, such a clause would not simply state in the Guaranty what the parties to the NOA will do.  Rather, it would become a promise of the parties to the Guaranty.  Similarly, here, when the parties to the Guaranty agree that they incorporate a clause saying that the "Parties agree to perform their respective obligations under the Agreement . . . while a dispute is being resolved," then that incorporation plainly means that the parties to the incorporating contract (i.e., the Guaranty) agree to perform their obligations under that contract pending resolution of any dispute.  Otherwise, the incorporation would do

- 14 -

no work.  See McMahon v. Monarch Life Ins. Co., 186 N.E.2d 827, 830 (Mass. 1962) ("[A] contract is to be construed to give a reasonable effect to each of its provisions.").

For the foregoing reasons, we find that the district court did not err in finding that MTC will likely prevail on its claim that Axia is obligated to continue performing its obligations as guarantor until the parties' underlying dispute is resolved.[1]

## B.

In addition to challenging the decision to issue a preliminary injunction, Axia also presents a litany of challenges to the substance of the injunction.  We address each challenge in turn.

## 1.

Axia first contends that only KCST has FCC authorization to operate the network, hence the district court cannot order Axia to do so without violating FCC regulations.  The premise behind this argument does not fit the facts as the parties describe them. KCST, while in bankruptcy, has not rejected the NOA and continues as network operator.  Under a Transitional Services Agreement, two Axia affiliates, Axia SuperNet Ltd. and Axia Connect Ltd., provide essential services for operating the network.  That arrangement was itself disclosed to the FCC at the time FCC approval was

---

[1] We address, below, the possibility that the district court may have overshot the mark on the $4 million cap.

- 15 -

obtained, when Axia told the FCC that KCST would "continue to use the technical, security, and customer support services currently provided to [KCST] by such affiliates of Axia." The district court's order simply requires Axia to maintain this status quo by continuing "to provide, through its affiliates Axia SuperNet Ltd. and Axia Connect Ltd., the same level of service to MTC's Network that those affiliates are currently providing, including all the technical, administrative, and operational support services they are currently providing for the 123 Network." The injunction also requires Axia as guarantor to make payments that KCST previously made under the NOA, but Axia makes no argument that the making of payments would constitute an activity prohibited by the FCC. To the contrary, the payments would seem to facilitate maintenance -- rather than interruption -- of the FCC-approved arrangement while the underlying dispute is resolved.

Axia posits that much of this might change if KCST were to stop performing at all as network operator. Why this would be so is not readily apparent. In any event, KCST apparently now continues to serve as network operator. The bankruptcy court has also lifted the automatic stay of actions seeking relief involving KCST with regard to any action or order "as may be necessary to enforce the preliminary injunction and any related orders." And any lack of funds that might otherwise keep KCST from continuing to serve as network operator would seem to be taken care of by the

compelled payments of Axia. On such a record, we see no need to accept Axia's invitation to speculate about a hypothetical change to the status quo in the short time remaining before the arbitration is completed. This is especially so where that change to the status quo could take many forms, the differences among which could be dispositive to our resolution. And it is even more so where the parties point us to little substantive law that would govern our resolution of these hypothetical situations.

We similarly see no merit in Axia's contention that the FCC's decision denying reconsideration sought by MTC precludes MTC "from conducting any further litigation challenging KCST's operation of MTC's Network" on the basis of issue or claim preclusion. Issue preclusion would only apply in this case if Axia could show, among other things, that the two proceedings involved "the same issue of law or fact." See Vargas-Colón v. Fundación Damas, Inc., 864 F.3d 14, 26 (1st Cir. 2017) (quoting Robb Evans & Assocs. v. United States, 850 F.3d 24, 32 (1st Cir. 2017)). But the issues in the FCC's reconsideration -- the procedural propriety of MTC's motion and whether reconsideration of the FCC's prior decision "is required in the public interest" -- are squarely different than the issues in this appeal. And if Axia instead intends its argument to sound in claim preclusion, it fares no better. MTC's motion for reconsideration before the FCC and its current attempt to enforce the Guaranty's contractual

- 17 -

provisions are not "causes of action . . . sufficiently identical or related for claim preclusion purposes." <u>Airframe Sys., Inc.</u> v. <u>Raytheon, Co.</u>, 601 F.3d 9, 15 (1st Cir. 2010).

**2.**

Axia next contends that the district court's order imposes on it a greater financial burden than permitted by the Guaranty. Axia's liability under the Guaranty is expressly "limited to and capped at" $4 million. The Guaranty thus states that, "should [Axia] advance to MTC funds up to said amount, [Axia] shall have no further obligation or liability under this Agreement." The parties appear to have no dispute concerning the meaning of this cap. Rather, they disagree about whether the district court's order respects that cap. The order certainly acknowledges the cap by providing that, once Axia's payments under the Guaranty reach $4 million, the order's provisions requiring Axia to "pay all invoices" and provide affiliate services "shall no longer have effect." But, the order also requires Axia to provide commercially reasonable transfer assistance, should MTC so request. And in connection with those services, the order requires Axia to provide MTC with all information concerning the network in Axia's possession. These latter two requirements are not subject to the order's $4 million limitation. Rather, they are limited only in their duration. The order provides that Axia's obligations

under these two requirements will cease after providing transfer assistance for one year.

Axia contends that complying with the order could therefore require Axia to expend more than $4 million in total. This might occur, for example, should Axia hit the $4 million cap but have remaining transfer assistance obligations.

We agree with Axia that, under certain circumstances, without any change to the status quo, the district court's order could subject Axia to burdens that exceed the cap. MTC argues that the unlimited obligation to provide transfer assistance and information for a specific period of time is justified by the fact that the NOA so obligates KCST, and Axia as guarantor must perform KCST's obligations. But, as we have explained, and as MTC acknowledges, the Guaranty comes with an express cap. So, on this issue, the order modifies rather than merely enforces Axia's promise to perform during the dispute.

Therefore, we remand to the district court with instructions to amend the order so as to make clear that Axia's obligations terminate once it has <u>properly</u> expended $4 million in complying with the Guaranty.[2] For the sake of clarity, we note that only Axia's net costs properly attributed to its performance

---

[2] We express no opinion on what application, if any, the cap would have to a liability arising from a source other than properly complying with the Guaranty.

- 19 -

under the Guaranty count toward the $4 million cap, but leave it to the district court to resolve, should the issue arise, the precise contours of this requirement.

**3.**

Axia also argues that the injunction fails to abide by the requirements imposed by Rule 65 of the Federal Rules of Civil Procedure. Axia contends that the court both failed to order a sufficient bond under Rule 65(c), and failed to state the terms of the order "specifically," as required by Rule 65(d)(1)(B).

Under Rule 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). The purpose of such a bond is to ensure that the enjoined party may readily be compensated for the costs incurred as a result of the injunction should it later be determined that it was wrongfully enjoined. See Global NAPs, Inc. v. Verizon New England, Inc., 489 F.3d 13, 20-21 (1st Cir. 2007). The bond also serves to provide notice to the moving party as to the "maximum extent of its potential liability, since the amount of the bond 'is the limit of the damages the [enjoined party] can obtain for a wrongful injunction.'" Id. at 21 (quoting Continuum Co. v. Incepts, Inc., 873 F.2d 801, 803 (5th Cir. 1989)). By providing that the bond should be "in an amount that the court considers

proper," Fed. R. Civ. P. 65(c), the Federal Rules of Civil Procedure vest the district court with "wide discretion," Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir. 1961).[3]  In this case, after holding a hearing, the district court required MTC to post a $4 million bond.

Axia first argues that the district court abused its discretion because Axia could plausibly expend more than $4 million in complying with the order.  But, because we remand on this aspect of the order, as explained above, this challenge is now moot.  And even if it were not, Axia does not point us to any authority, nor are we aware of any, that establishes the proposition that it is not within the district court's discretion to require a bond for less than the upper bound of what the enjoined party could, in theory, expend.  We also note that the bond is only intended to protect the enjoined party pending the outcome of the underlying dispute.  See Global NAPs, Inc., 489 F.3d at 21-22.  Thus, the district court need only require "an amount that the court considers proper," Fed. R. Civ. P. 65(c), for the time between when it issues the injunction and when the arbitration will likely

---

[3]  The Second Circuit in Ferguson considered a version of the rule that read, "in such sums as the court deems proper."  The rule has been amended to now read, "in an amount that the court considers proper."  We do not think that these minor changes alter the discretion granted to the district court.

conclude. The sum is not intended to cover the enjoined party's contractual liability beyond the scope of the injunction.

Axia further argues that it was an abuse of discretion for the district court not to account for the possibility that, after handing over the network passwords to MTC, as the district court later required, Axia could be liable should something happen to the network. We do not think this argument gets off the ground. For one, Axia has not explained how it might incur liability as a result of giving the passwords to MTC beyond what it would risk as a result of KCST's normal operation of the network. And if Axia's argument is simply that it might incur liability from its own conduct, or that of KCST, we do not see how the court could plausibly be required to take such contentions into account in calculating a bond. For example, should a court require a distributor to perform its distribution obligations during a dispute, we do not think that the district court would be obligated to require the moving party to post a bond that covers the potential liability that might be incurred should the distributor's drivers cause an accident on the job.

Axia next contends that the order's requirement that Axia "continue to provide, through its affiliates . . . the same level of service that those affiliates are currently providing" runs afoul of the requirement in Rule 65(d)(1)(B) that an injunction "state its terms specifically." Fed. R. Civ.

P. 65(d)(1)(B).  The order, Axia argues, is too vague to pass scrutiny under this standard, and renders Axia vulnerable to contempt proceedings.  We disagree.

The "specificity requirements are not 'merely technical' but are 'designed to prevent uncertainty and confusion and to avoid basing a 'contempt citation on a decree too vague to be understood.'" NBA Props. v. Gold, 895 F.2d 30, 32 (1st Cir. 1990) (alterations omitted) (quoting Schmidt v. Lessard, 414 U.S. 473, 476 (1974)).  The purpose of the specificity requirement is to protect "the elementary due process requirement of notice." Scott v. Schedler, 826 F.3d 207, 212 (5th Cir. 2016) (per curiam) (quoting U.S. Steel Corp. v. United Mine Workers of Am., 519 F.2d 1236, 1246 (5th Cir. 1975)).  An "injunction must simply be framed so that those enjoined will know what conduct the court has prohibited." Meyer v. Brown & Root Constr. Co., 661 F.2d 369, 373 (5th Cir. 1981) (citing Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n, 389 U.S. 64, 75 (1967)).  Thus, an order that "judgment . . . is entered in accordance" with an opinion that merely states that the plaintiff is "entitled to . . . injunctive relief," without more, fails the test. Mass. Ass'n of Older Ams. v. Comm'r of Pub. Welfare, 803 F.2d 35, 40 (1st Cir. 1986) (alteration in original) (quoting Schmidt, 414 U.S. at 474).  But, conversely, "elaborate detail is unnecessary." Islander E. Rental

- 23 -

Program v. Barfield, 145 F.3d 359, 1998 WL 307564, at *4 (5th Cir. Mar. 24, 1998) (per curiam) (unpublished).

This order passes muster. We see no reason why Axia does not know, or could not readily discern, the precise level of services its affiliates had been providing. Nor has Axia advanced any reason as to why it may be in the dark. Further, we note that the affiliates' responsibilities to KCST are spelled out in a thirty-two page "Transitional Services Agreement." And, to the degree that Axia's concern stems from a worry that its good faith attempts to comply with the order nevertheless render it vulnerable to contempt proceedings, our case law accounts for such concerns by cautioning courts against finding contempt when faced with genuine ambiguities about an order's scope. See NBA Props., 895 F.2d at 32 ("[W]e must read any 'ambiguities' or 'omissions' in such a court order as 'redound[ing] to the benefit of the person charged with contempt.'" (quoting Ford v. Kammerer, 450 F.2d 279, 280 (3d Cir. 1971) (per curiam))).

**4.**

Axia's remaining challenges fare no better. Axia argued in its briefs that the order runs afoul of the automatic bankruptcy stay's prohibition on actions that "exercise control over property of the estate." 11 U.S.C. § 362(a)(3). On January 18, 2018, however, the bankruptcy court lifted the stay to allow the district court to take any actions necessary to enforce the preliminary

- 24 -

injunction.  This action moots Axia's challenge under the bankruptcy stay.

To the degree that Axia contends that the district court, in granting MTC's motion for a preliminary injunction, abused its discretion in finding irreparable harm to MTC or in its balance of equities analysis, Axia has simply pointed us to nothing that would cause us to conclude that the district court went beyond the bounds of its discretion.  The district court conducted several days of hearings before reaching its conclusions, during which it considered many of the same arguments Axia now advances on appeal. We see no abuse of discretion in the district court's conclusions.

We have considered the remaining arguable challenges sprinkled without any development through Axia's brief, and find them likely without merit, and certainly waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

## III.

For the foregoing reasons, we affirm the district court's judgment as modified by this opinion, and remand to the district court for the limited purpose of amending the order to make clear that Axia's obligations terminate once Axia itself has properly expended $4 million in complying with the Guaranty.