# United States Court of Appeals
## For the First Circuit

No. 19-1649

AXIA NETMEDIA CORPORATION,

Plaintiff, Appellant,

KCST USA, INC.,

Plaintiff,

v.

MASSACHUSETTS TECHNOLOGY PARK CORPORATION,
d/b/a Massachusetts Technology Collaborative,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

---

Before

Howard, Chief Judge,
Lipez, Circuit Judge,
and Saris, U.S. District Judge.*

---

Brian P. Voke, with whom Adam A. Larson and Campbell Conroy & O'Neil, P.C. were on brief, for appellant.
Robert J. Kaler, with whom Edwin L. Hall and Holland & Knight LLP were on brief, for appellee.

---

* Of the District of Massachusetts, sitting by designation.

August 31, 2020

**LIPEZ**, **Circuit Judge**. Massachusetts Technology Park Corporation, an independent public instrumentality of the Commonwealth of Massachusetts operating under the name Massachusetts Technology Collaborative ("MTC"), owns a fiber-optic network in western Massachusetts known as the Massbroadband123 Network. Before the network was built, MTC contracted with Axia NGNetworks USA, Inc. -- now called KCST USA, Inc. ("KCST") -- to operate and market the network. MTC also secured a guaranty of KCST's obligations under the contract from KCST's parent company, Axia NetMedia Corporation ("Axia").

The relationship between MTC and Axia deteriorated after the network was built. Axia ultimately sued MTC in federal district court over the guaranty agreement and MTC procured an order compelling arbitration of the parties' dispute. The arbitrator found that MTC had materially breached the underlying contract with KCST, and, accordingly, that the guaranty agreement was void for failure of consideration. Axia sought confirmation of the arbitration award while MTC, dissatisfied with the arbitrator's decision, sought vacatur or modification of the arbitration award under section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a). The district court concluded that the arbitrator had exceeded the scope of his powers, see id. § 10(a)(4), and vacated the portion of the arbitration award that voided the guaranty. Axia has appealed that decision.

Concluding that the arbitrator acted within the scope of his powers, we reverse and remand with instructions to enter an order confirming the arbitration award.

**I.**

We begin by providing background about the relevant provisions of the contracts between MTC and KCST and between MTC and Axia, the breakdown of the relationship among MTC, KCST, and Axia, and the arbitrator's and district court's decisions. This is not the first time that the dispute between MTC and Axia has come before us. See Axia NetMedia Corp. v. Mass. Tech. Park Corp. (hereinafter Axia I), 889 F.3d 1 (1st Cir. 2018) (affirming preliminary injunction as modified); see also Axia NetMedia Corp. v. Mass. Tech. Park Corp., Nos. 18-2180, 18-2192, 2019 WL 2273650 (1st Cir. Apr. 9, 2019) (dismissing appeals from district court orders denying Axia's motion to execute on preliminary injunction bond). We draw background facts from our prior published opinion where appropriate.

**A. The Contracts**

In 2010, MTC received state and federal funding to build the Massbroadband123 Network to provide high speed broadband service to underserved communities in western and north central Massachusetts. Shortly before the funding was approved, MTC solicited proposals from telecommunications companies to operate and market the soon-to-be-built network. Axia, a Canadian company

- 4 -

seeking to expand into the United States market, submitted a bid on behalf of its newly created United States subsidiary, KCST. MTC selected KCST to be the network operator. On February 25, 2011, MTC and KCST entered into the Agreement for Network Operator Services (the "Network Operator Agreement" or "NOA"), and MTC and Axia entered into the Guaranty Agreement (the "Guaranty") that is at issue in this appeal.

Under the terms of the NOA, MTC was responsible for constructing the network[1] and turning it over to KCST in segments. The planned network, as described in the NOA, would be "a 1,338-mile fiber-optic network with new fiber running through or near 124 communities in western and north central Massachusetts" that connected to 1,392 Community Anchor Institutions ("CAIs"). CAIs are state or community facilities, like schools, libraries, hospitals and police departments. These facilities "are directly connected to the network[ and] serve as hubs of connectivity for extending the network to other customers." Axia I, 889 F.3d at 5. The NOA defines a CAI as "any one of the organizations and agencies identified in" a list that was appended to the NOA, which was subject to revision by MTC "from time to time in MTC's sole discretion."

---

[1] MTC contracted with another company, G4S Technology LLC, to design and construct the network.

- 5 -

The NOA details the many responsibilities that KCST agreed to assume as the "Network Operator."  In short, KCST was "responsible for all aspects of the management, sales, monitoring, operations, support, and maintenance of" the Massbroadband123 Network.  Also, it was responsible for "pay[ing] for all ongoing costs of operating" the network "and all costs of compliance with the terms of" the NOA.  KCST, additionally, paid an annual fee to MTC.  "In return, KCST retained the network's revenue up to a defined threshold, above which it agreed to share the revenue with MTC."  Axia I, 889 F.3d at 4.

By its express terms, the NOA would not take effect until Axia signed the Guaranty:

> 12.14    Parent Guaranty.  This Agreement [the NOA] shall become binding only upon condition that Network Operator's parent company, Axia NetMedia Corporation, executes and delivers to MTC a guaranty of obligations of Network Operator hereunder in a form acceptable to MTC, with a limit of liability no less than four million ($4,000,000) U.S. dollars.

In the Guaranty, Axia promised that, should KCST "default in any of its payment or performance obligations under the Network Operator Agreement," Axia would "make all such payments and perform all such obligations of the Network Operator" under the NOA, and would "fully and punctually pay and discharge . . . any and all costs, expenses and liabilities" associated with those obligations.  The Guaranty was "limited to and capped at the amount

- 6 -

of" $4 million and it provided that, should Axia "advance to MTC funds up to said amount, [Axia] shall have no further obligation or liability under this Agreement."

The Guaranty also provided that its validity would be unaffected by potential breaches of the NOA by KCST:

> 2.3 This Agreement and the liability hereunder shall not be affected or impaired by any compromise, settlement, release, renewal, extension, indulgence, change in or modification of any of the obligations and liabilities of Network Operator under the Network Operator Agreement, or by any failure on the part of MTC, its successors or assigns, to realize upon any obligations or liabilities of Network Operator.

The Guaranty said nothing about what effect, if any, potential breaches of the NOA by MTC would have on its continuing validity.

Finally, both the NOA and the Guaranty address dispute resolution. The NOA provides that any dispute between MTC and KCST that cannot be resolved through informal dispute resolution procedures "will be finally settled by binding arbitration conducted in accordance with the [American Arbitration Association] Rules." Under the Guaranty, all disputes between MTC and Axia that could not be resolved in mediation would "be resolved by litigation in a court serving Middlesex County, Massachusetts," unless "MTC elect[ed] arbitration as the method of dispute resolution for a given dispute." The Guaranty provides that, "at MTC's sole election, MTC may file a demand for arbitration by the

- 7 -

American Arbitration Association in its office serving Boston, Massachusetts." (Emphasis added.)

## B. Factual and Procedural Background[2]

The construction of the network did not go as planned. The NOA required MTC to deliver the network to KCST in segments, as it was completed, with all thirty-six segments being turned over to KCST no later than August 25, 2013. MTC delivered only one network segment to KCST by that date. MTC then turned over more than half of the network at once in late December 2013 and the remaining segments in early 2014. In addition, the network was smaller in size and scope than the NOA contemplated, with fewer than the anticipated 1,392 CAIs connected to it.[3]

KCST initially responded to MTC's delays and other shortfalls by asking MTC to renegotiate the commercial terms of the NOA. When those negotiations proved unsuccessful, KCST threatened to withhold payments due MTC, which MTC relied upon to

---

[2] We draw the background information primarily from the arbitration award, as the parties are bound by the arbitrator's view of the facts. See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 37-38 (1987).

[3] The parties dispute the number of CAIs that were connected to the network at the time it was turned over to KCST, with estimates ranging from 901 on the low end to 1,225 on the high end. The arbitrator did not resolve this factual dispute but found that, "[a]ccepting any of the[] numbers from either side as accurate, it is plain that MTC had a material shortfall in its failure to deliver connected CAIs reasonably approaching" the promised 1,392 in total.

pay for overhead and other network-related costs. MTC promptly sought and obtained a preliminary injunction in Massachusetts Superior Court in mid-2014 requiring KCST to perform its obligations under the NOA, including making payments to MTC.

For the next two years, KCST performed its obligations under the NOA, but it was losing money and required loans from Axia to meet the demand on its financial resources. Then, "[i]n 2016, a Swiss investment firm acquired a controlling position in Axia." Axia I, 889 F.3d at 5. To facilitate approval of the acquisition by the Federal Communications Commission ("FCC") -- required because the FCC had authorized KCST to operate the network -- Axia transferred all KCST shares into a trust, see id., of which Axia was the sole beneficiary. KCST retained its original name -- Axia NGNetworks USA, Inc. -- at that time, but changed its name to KCST USA, Inc. in February 2017.

On March 22, 2017, KCST filed a voluntary petition for Chapter 11 bankruptcy, an "Event of Default" that triggered Axia's obligations under the Guaranty. On the same day, Axia preemptively filed this lawsuit against MTC in federal district court, seeking a declaratory judgment that the Guaranty was unenforceable because MTC had materially breached the NOA. MTC secured a preliminary injunction, which required Axia to perform its obligations under the Guaranty while the parties resolved their contract dispute. See id. at 4. And, as we noted at the outset, MTC successfully

- 9 -

moved to compel arbitration of the dispute with Axia pursuant to the dispute resolution provision in the Guaranty.

Also, before the bankruptcy court, MTC filed a proof of claim against KCST's bankruptcy estate seeking damages for alleged breaches of the NOA by KCST. KCST, in turn, commenced an adversary proceeding against MTC, objecting to MTC's claim and asserting counterclaims against MTC for its alleged breaches of the NOA. MTC filed a motion to compel arbitration of the competing claims, which the bankruptcy court granted. The arbitration of the dispute between MTC and KCST was then consolidated with the arbitration proceedings between MTC and Axia, which were already underway.[4]

The arbitration proceedings were conducted before a sole arbitrator, who received documentary evidence from the parties and heard twenty-seven days of live testimony.[5] The arbitrator issued his decision in the fall of 2018 in three parts: the Partial Final Award ("PFA"), the Final Award and Modification of Partial Final Award, and the Modification of Final Award.

---

[4] Although the arbitration proceedings were consolidated, the two disputes arose from different contracts and originated in different fora. They retained their separate identities, and the arbitrator's resolution of each dispute thus needed to be confirmed in the forum where it originated after the arbitration proceedings concluded.

[5] MTC raises issues with the arbitrator selection process in the factual background section of its brief but does not later argue that those issues provide a basis to vacate the arbitrator's award. We therefore do not address them.

In the PFA, the arbitrator found that "MTC failed to deliver a network within a reasonable range of the 1,392 CAIs that it contracted to provide under the NOA," that it "failed to 'connect' a significant number of CAIs" to the network, and that it "failed to comply with its obligations to deliver the Network in a timely manner and in segments to achieve a cost-effective rollout." The arbitrator concluded that these failures amounted to a material breach of the NOA.[6]

As to remedy, the relief granted to KCST "for MTC's breach [wa]s that of reformation of the NOA" to make the terms of the contract commercially reasonable in light of MTC's "failed Network delivery obligations."[7] The arbitrator also granted relief

---

[6] The arbitrator also found misconduct on the part of KCST and Axia. Most notably, during the time leading up to KCST's bankruptcy filing, the companies failed to disclose to MTC that KCST had stopped paying network vendors (to the tune of hundreds of thousands of dollars of unpaid obligations) and that it was in dire economic straits. As a result, "the surprise attack of the KCST bankruptcy filing and Axia federal court litigation . . . combined to achieve maximized impact, as they were surely calculated to do." But the arbitrator concluded that KCST and Axia "escape[d] the consequences of these wrongful actions" because MTC accepted "curing performance" by Axia and because MTC failed to prove any damage caused by the delay in disclosure of KCST's financial situation.

[7] The arbitrator explained that reformation of the NOA was an appropriate remedy based on both the language of the NOA and the record. Specifically, the arbitrator relied on section 5.2.7 of the NOA, in which MTC promised to cooperate with KCST to "effect the goals, objectives and purposes" of the contract "in a commercially reasonable manner." The arbitrator also observed that "the record reflects that at the time of [MTC's] breach [KCST] did not seek to terminate and claim damages, but rather it . . .

- 11 -

to Axia, observing that "the underlying consideration for the Axia Guaranty was the NOA, and MTC materially breached it." As a result, "MTC was not entitled to the benefits it secured" pursuant to the district court's preliminary injunction order requiring Axia's continued performance of its obligations under the Guaranty while the parties' dispute was ongoing. Thus, Axia was "entitled to recoup" from MTC over $4 million in costs that it had incurred in connection with the preliminary injunction order.

After the arbitrator issued the PFA, MTC asked the arbitrator to clarify "the meaning of the PFA as to the continued effectiveness of the Guaranty . . . going forward." MTC explained that Axia understood the PFA to mean that the Guaranty was "'void' going forward," but that MTC disagreed with that interpretation. MTC insisted that the Guaranty remained valid, and that "the effect of MTC making the payments to Axia required by the PFA would be to reinstate the full value of the Guaranty." In other words, MTC argued, "the $4 million limitation on Axia's performance obligations would be reset" when MTC made the required payments to Axia.

In response to MTC's request for clarification, the arbitrator specified in the Final Award and Modification of Partial

---

continued to seek financially adjusted terms for ongoing performance of the NOA." The arbitrator treated that choice by KCST as an "election of remedies."

- 12 -

Final Award that "MTC lost on its request for declaratory relief with respect to the continued validity of the Guarant[y], as reflected in . . . the PFA."  The arbitrator explained that this result was justified under Massachusetts law because "the breach by MTC found in the PFA went at once to the 'essence' or 'foundation' of the NOA and underlying consideration of the Guarant[y]."  In addition, the arbitrator found that MTC had not met its burden to prove that, if the parties had independently renegotiated the contract, MTC would have conditioned its acceptance of the reformed NOA on the execution of a new guaranty agreement by Axia.  Since "the record was simply devoid of specific persuasive evidence in this regard," the arbitrator concluded, MTC could not prevail on the issue.

MTC and Axia returned to the district court, where Axia moved for confirmation of the arbitration award and MTC moved to vacate it insofar as it voided the Guaranty, arguing that the arbitrator had acted outside the scope of his authority in doing so.[8]  As we recounted above, the district court agreed with MTC and granted MTC's motion to partially vacate the arbitration award.

**II.**

We apply de novo review to a district court's decision to confirm or vacate an arbitration award.  Dialysis Access Ctr.,

---

[8] KCST secured confirmation in the bankruptcy court of the portion of the arbitration award that reformed the NOA.

LLC v. RMS Lifeline, Inc., 932 F.3d 1, 7 (1st Cir. 2019).  In doing so, however, we are mindful that "[t]he authority of a federal court to disturb an arbitration award is tightly circumscribed." Cytyc Corp. v. DEKA Prods. Ltd. P'ship, 439 F.3d 27, 32 (1st Cir. 2006).  After all, "the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge," and thus "it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept."  United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 37-38 (1987).

Although our review is limited, "arbitration awards are not invincible, and there are 'a few exceptions to the general rule that arbitrators have the last word.'"  Hoolahan v. IBC Advanced Alloys Corp., 947 F.3d 101, 111 (1st Cir. 2020) (quoting Cytyc Corp., 439 F.3d at 32-33).  Under section 10(a) of the FAA, federal courts are authorized to vacate an arbitral award only when (1) "the award was procured by corruption, fraud, or undue means," (2) "there was evident partiality or corruption" on the part of the arbitrator, (3) the arbitrator is guilty of misconduct that prejudices the rights of a party, including refusing to postpone the hearing when sufficient cause has been shown and refusing to hear evidence that is "pertinent and material to the controversy," or (4) the arbitrator "exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award

- 14 -

upon the subject matter submitted was not made." 9 U.S.C. § 10(a).[9]

Only the claim that the arbitrator exceeded his powers is at issue in this appeal.

An arbitrator's decision may be vacated when the arbitrator "strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice.'" Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 671 (2010) (alteration in original) (quoting Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (per curiam)). In so doing, an arbitrator acts outside the scope of his "contractually delineated powers." First State Ins. Co. v. Nat'l Cas. Co., 781 F.3d 7, 11 (1st Cir. 2015). If, however, the

---

[9] We have also recognized in earlier case law "a second set of exceptions [that] flows from the federal courts' inherent power to vacate arbitral awards." Hoolahan, 947 F.3d at 111 (quoting Cytyc Corp., 439 F.3d at 33). This "very narrow" authority, Cytyc Corp., 439 F.3d at 33, arises in cases where the arbitrator acted "in manifest disregard of the law," Advest, Inc. v. McCarthy, 914 F.2d 6, 9 n.6 (1st Cir. 1990); see also id. at 9-10; Hoolahan, 947 F.3d at 111. The Supreme Court's decision in Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576 (2008), however, cast doubt on "[t]he availability of non-statutory grounds to vacate an arbitration award." Hoolahan, 947 F.3d at 111 n.14; see Hall Street, 552 U.S. at 584-87 ("[T]he text [of the FAA] compels a reading of the §§ 10 and 11 categories [for vacating and modifying arbitration awards] as exclusive."). We "have not squarely determined whether our manifest disregard case law can be reconciled with Hall Street," Kashner Davidson Sec. Corp. v. Mscisz, 601 F.3d 19, 22 (1st Cir. 2010); see also Hoolahan, 947 F.3d at 111 n.14, and we need not do so here. The district court did not rely on the manifest disregard doctrine, see Axia NetMedia Corp. v. Mass. Tech. Park Corp., 381 F. Supp.3d 128, 134 n.4 (D. Mass. 2019), and MTC does not argue that the doctrine provides a distinct basis for affirming the district court's decision.

award "'draw[s] its essence from the contract' that underlies the arbitration proceeding" and the arbitrator was "even arguably construing or applying the contract and acting within the scope of [his] authority," the award must stand -- even if the arbitrator committed serious legal or factual error. Cytyc Corp., 439 F.3d at 32 (quoting Misco, 484 U.S. at 38). MTC bears the burden "to establish that the arbitrator's award should be set aside." Hoolahan, 947 F.3d at 110 (quoting Dialysis Access Ctr., 932 F.3d at 7).

We note the limited scope of MTC's claim. The question of whether the arbitrator exceeded his powers by reforming the NOA is not before us, nor was it before the district court. Just as the district court ordered MTC and Axia to resolve their contract dispute over the Guaranty through arbitration, the bankruptcy court ordered MTC and KCST to resolve their competing claims of breach of the NOA -- which were originally raised in an adversary proceeding in the bankruptcy court -- through arbitration. Hence, the bankruptcy court was the proper forum for a challenge to the arbitrator's resolution of MTC and KCST's dispute over the NOA, including the relief awarded to KCST for MTC's material breach of the NOA. But MTC chose not to pursue such a challenge. Instead, it poses in this proceeding a more limited question -- whether the arbitrator acted outside the scope of his authority by determining

- 16 -

that the Guaranty agreement was void for failure of consideration as a result of MTC's material breach of the NOA.[10]

The district court concluded that "the arbitrator exceeded his powers under the FAA by prospectively voiding the Guaranty while re-writing the terms of the NOA."  Axia NetMedia Corp. v. Mass. Tech. Park Corp., 381 F. Supp. 3d 128, 138 (D. Mass. 2019).  The court reasoned, first, that "there is evidence that the parties never intended to bestow this power upon the arbitrator" because arbitrators do not have the power to rewrite contracts or stray from the scope of the parties' agreement.  See id.  Second, the court rejected the arbitrator's finding that "the record was simply devoid of specific persuasive evidence" that MTC would have insisted upon a Guaranty in any independent renegotiation of the NOA.  Id.  The court observed that section 12.14 of the NOA, section 2.3 of the Guaranty, and testimony and circumstantial evidence presented to the arbitrator demonstrate the necessity of the Guaranty.  Id. at 138-39.

---

[10] This decision of MTC to accept in the bankruptcy court proceedings the arbitrator's resolution of its dispute with KCST -- the reformation of the NOA -- while refusing to accept his resolution of the dispute with Axia -- invalidating the Guaranty because of the material breach of the NOA -- arguably could have precluded MTC from challenging that reformation decision here in the guise of challenging only the decision on the Guaranty. Indeed, Axia made preclusion arguments before the district court, which rejected them, and renews those arguments here.  Without making any judgments on these arguments, we choose to reject the district court's decision on a different basis.

- 17 -

The district court's reasoning is incompatible in several respects with the limited role of the courts in reviewing arbitration awards. The question of the Guaranty's validity was squarely before the arbitrator as a result of MTC's strategic choices. The dispute resolution provision of the Guaranty gave MTC the power to seek arbitration of disputes with Axia "at [its] sole election." MTC elected to pursue arbitration and, as the arbitrator noted in the PFA, sought "a declaration in th[e arbitration] proceeding that '[t]he Guaranty and NOA . . . are valid and enforceable contracts not subject to recession [sic] nor rendered null and void.'" In addition, after the PFA was issued, MTC sought further clarification from the arbitrator as to the validity of the Guaranty. MTC itself submitted the issue to the arbitrator and the arbitrator had the power to reach it. See DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 824 (2d Cir. 1997) ("Our inquiry under § 10(a)(4) . . . focuses on whether the arbitrator[] had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrator[] correctly decided that issue." (emphasis added)).

Moreover, it is clear from the text of the arbitral award that the arbitrator did not stray outside the scope of the parties' agreement with his decision. See First State Ins. Co., 781 F.3d at 11 ("In ascertaining whether [the] arbitrator[] arguably interpreted the underlying contract, an inquiring court must look

- 18 -

. . . to the text of the arbitral award."). The consideration underlying the Guaranty was the NOA, and specifically MTC's promise to build the network as described in the NOA. The arbitrator determined that MTC's failure to fulfill that promise constituted a material breach of the NOA, and that the material breach of the NOA constituted a failure of consideration for the Guaranty. Applying Massachusetts law, the arbitrator concluded that the failure of consideration rendered the Guaranty void.[11] Thus, with its explicit reasoning, the arbitrator's decision "draw[s] its essence" from the contracts underlying the arbitration proceeding,[12] Misco, 484 U.S. at 38, and the arbitrator acted within the scope of his authority in rendering it.

In an effort to support its disapproval of the arbitrator's decision on the Guaranty, the district court observed that section 2.3 of the Guaranty supports MTC's view that the

---

[11] MTC argues that the arbitration award should be set aside because the arbitrator's application of Massachusetts law was "not even . . . colorable." Even if that were true, our limited review of the arbitrator's decision means that we must leave the award in place despite legal errors committed by the arbitrator, "[e]ven where such error is painfully clear." Dialysis Access Ctr., 932 F.3d at 9 (alteration in original) (quoting Advest, 914 F.2d at 8).

[12] The arbitrator's decision necessarily "draws its essence" from both the NOA and the Guaranty. The two contracts are connected because the NOA served as consideration for the Guaranty. Thus, the arbitrator's resolution of MTC and KCST's competing breach of contract claims based on the NOA affected his resolution of MTC and Axia's dispute over the validity of the Guaranty.

Guaranty must remain in place as long as the NOA is operative. We disagree. As we described above, section 2.3 provides that the Guaranty will remain valid regardless of any breaches of the NOA by the "Network Operator," i.e., KCST. The provision is silent, however, as to the effect (if any) of a material breach of the NOA by MTC on the validity of the Guaranty. Thus, section 2.3 does not constrain the arbitrator's power to determine the effect of such a breach.[13] And no other provision of the Guaranty limits the arbitrator's power to decide issues submitted to him by the parties, including the validity of the Guaranty itself.

Nor does the Guaranty limit the arbitrator's power to award appropriate remedies. The "Defaults and Remedies" provision of the Guaranty provides:

> No remedy herein conferred or reserved is intended to be exclusive of any other available remedy or remedies, if any, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute.

The Guaranty also incorporates by reference the dispute resolution and arbitration provisions of the NOA, which likewise do not limit the arbitrator's choice of remedy. Thus, the decision to void the

---

[13] The district court also highlighted section 12.14 of the NOA, which requires a Guaranty from Axia if the NOA is to take effect. This provision does support an argument about the necessity of the Guaranty, but, as we explain below, we are not in a position to question the arbitrator's finding of fact on this score.

Guaranty prospectively as a choice of remedy was within the authority of the arbitrator. Indeed, "where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." Misco, 484 U.S. at 38.

The district court's disagreement with the arbitrator's factual finding as to the necessity of the Guaranty was not an appropriate basis for vacating the award. Federal courts "do not sit . . . to hear claims of factual or legal error by an arbitrator or to consider the merits of the award." Asociación de Empleados del Estado Libre Asociado de P.R. v. Local 1850, Unión Internacional de Trabajadores de la Industria de Automóviles, Aeroespacio e Implementos Agrícolas, 559 F.3d 44, 47 (1st Cir. 2009) (quoting Challenger Caribbean Corp. v. Union General de Trabajadores de P.R., 903 F.2d 857, 860 (1st Cir. 1990)). Thus, even if the arbitrator committed serious factual error by concluding that the record lacked "specific persuasive evidence" that MTC would insist upon a Guaranty as part of a renegotiation of the NOA, that would not "justify setting aside the arbitral decision." Cytyc Corp., 439 F.3d at 32.

In short, this is not a case where the arbitrator "ignore[d] the contract and simply dispense[d] 'his own brand of industrial justice.'" Kraft Foods, Inc. v. Local 1295, Office and Prof'l Emps. Int'l Union, 203 F.3d 98, 100 (1st Cir. 2000) (quoting

- 21 -

<u>United Steelworkers of Am.</u> v. <u>Enter. Wheel & Car Corp.</u>, 363 U.S. 593, 597 (1960)).  To the contrary, the arbitration award is grounded in the record and the parties' agreement.  The arbitrator did not exceed the scope of his powers under section 10(a)(4) of the FAA.  Accordingly, we reverse the district court's ruling and remand the case with instructions to enter a judgment confirming the arbitration award.

<u>So ordered.</u>