# United States Court of Appeals
## For the First Circuit

No. 19-1444

GERALD R. HOOLAHAN,

Petitioner, Appellee,

v.

IBC ADVANCED ALLOYS CORP.,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Thompson, Circuit Judges.

Ryan S. Lean, with whom Keesal, Young & Logan, Douglas B. Rosner, Matthew P. Horvitz, and Goulston & Storrs, PC were on brief, for appellant.
Stephen F. Gordon, with whom Todd B. Gordon and The Gordon Law Firm LLP, were on brief, for appellee.

January 17, 2020

**Thompson**, **Circuit Judge**.    In 2010, Appellant IBC Advanced Alloys Corp. ("IBC") purchased Beralcast Corporation ("Beralcast") from Appellee Gerald R. Hoolahan and Gary Mattheson in exchange for cash and shares in IBC.  Over a year later, Hoolahan went to sell his IBC Shares, but he was blocked.  He did not know why at the time.  A few years later in 2015, Hoolahan discovered that Mattheson hadn't been similarly blocked when he placed his shares on the market in 2011.  Upset by this disparate treatment and believing that he had been conned out of large sums of money, Hoolahan initiated an arbitration against IBC.  During a one-day hearing it came to light that IBC had harbored "ill-will" against Hoolahan due to a claim tangentially related to the IBC-Beralcast deal, causing it to block Hoolahan's 2011 attempt to sell.  In the end the arbitrator awarded Hoolahan damages in the amount he would have received if he could have sold his shares at the same rate Mattheson got in 2011; Hoolahan also received attorneys' fees and costs.

Finding this all woefully unfair, IBC embarked on its Mt. Everest climb:  it decried the arbitrator's calculations and first requested that the arbitrator modify the award.  Denied there, it kept trekking, and asked the district court to vacate the award.  Denied again, but still seeking the mountaintop, IBC appealed to this court.  And here we are.

IBC asks us now to vacate, or at the very least remand for reconsideration, the arbitrator's award. IBC's slog continues to be nothing but uphill. That is because our review of arbitral awards is extremely narrow, and we afford great deference to the arbitrator's decision-making process. To be sure, there are certain exceptions where we will vacate an award, but IBC has failed to convince us that any of them apply here. And so we affirm.

I.    **BACKGROUND**

   **A.** **The Parties**

Appellant IBC is a "beryllium and copper advanced alloys company . . . [that] serves a variety of industries such as defense, aerospace, automotive, [and] telecommunications . . . ."[1] Appellee Hoolahan owned two companies, Advanced Specialty Metals and Composite Material Solutions ("CMS"); certain assets from both those companies were combined to form a new company: Beralcast, that uses beryllium in its manufacturing operations. Hoolahan and Mattheson were the only two shareholders of Beralcast.

The United States has classified beryllium as a strategic material, as "[i]t has extensive use in the Defense Industry, and users are required to keep strict control of the usage and location of their beryllium inventory." For companies

---

[1] https://ibcadvancedalloys.com/home/about-us/

like Beralcast, there are only two commercial sources of beryllium: (1) the Materion Corporation and (2) ULBA, a Kazakhstan Government-owned corporation. Because Materion is a direct competitor of Beralcast, Beralcast relies on ULBA for its beryllium. Hoolahan also owned a separate company, Applied Materials Science, Inc. ("AMS"), a sister company to CMS, who would also purchase beryllium from ULBA (we'll get to why that's important in a bit).

**B. The Agreement**

On February 17, 2010, IBC (and its subsidiary) purchased Beralcast for its beryllium manufacturing operations from Hoolahan and Mattheson. In exchange, Hoolahan and Mattheson received $2.25 million in cash consideration (the full amount deposited into the bank account for AMS), and shares of capital stock in IBC ("IBC Shares") equivalent in value to $2 million. Hoolahan received 7,303,271 IBC Shares; Mattheson, 5,957,905. The purchase and its terms are set forth in a Share Purchase and Sale Agreement (the "Agreement").

The Agreement's articles most relevant to this appeal are:

- Two sub-articles of **article 2.3**, "Payment of Purchase Consideration":
  - **Article 2.3(e)(i)(A)** (prohibiting the sale, transfer, or trade of IBC Shares on the TSX Venture Exchange, a stock exchange in Canada, for *four months and one day* after the closing of the Agreement).
  - **Article 2.3(e)(ii)** (relieving IBC of any obligation "to register the IBC Shares or to

take any other actions to facilitate or permit any resale or transfer thereof in the United States or otherwise by or to a US Person . . . .").

- **Article 3.2(p)**, "Judgments and Claims" (Hoolahan and Mattheson representing and warranting that there were no unsatisfied judgments, claims, or potential claims against Beralcast at the time of the Agreement).

- **Article 13.3**, "Further Assurances" (obligating the Parties to "execute, acknowledge and deliver such other instruments and take such other action as may be reasonably necessary to carry out their obligations under this Agreement").

- **Article 13.6**, "Governing Law" (agreeing that the Agreement be "interpreted and construed in accordance with the laws of the State of Delaware").

- **Article 13.6.2**, "Arbitration" (obligating the parties to arbitrate any disputes arising out of the Agreement in accordance with the Commercial Rules of the American Arbitration Association ("AAA Commercial Rules")).

- **Article 13.9**, "Time of the Essence" ("Time shall be of the essence in this Agreement and of all matters contemplated in this Agreement.").

**C. Hoolahan's Attempts to Sell his IBC Shares**

Over a year after the Agreement's execution, and well past the "four months and one day" time constraint from article 2.3(e)(i)(A), in late April or early May of 2011, Hoolahan attempted to sell his IBC Shares through his brokerage firm, Edward Jones.[2]  At that time, IBC Shares were valued at $0.27 per share, so Hoolahan's total shares would have been worth approximately $1,971,883.10.  On July 25, 2011, IBC's Toronto (Canada) transfer agent informed Hoolahan's brokerage firm that Hoolahan's request

---

[2] It is unclear from the record where or to whom Hoolahan attempted to sell his shares in 2011.

- 5 -

for sale had been denied because the agent had been "unsuccessful in obtaining approval [for the sale] from the issuer" — IBC. That same letter advised Hoolahan's brokerage firm to "contact the issuer" about the denial. Hoolahan then handed the issue over to his legal counsel, Bruce Schoenberger, to investigate.

Schoenberger started by contacting Hoolahan's brokerage firm. On May 16, 2012, an administrator from the firm emailed Schoenberger's colleague that Schoenberger needed to contact IBC's Chief Financial Officer, Simon Anderson, regarding Hoolahan's inability to sell his shares. That same day, Schoenberger spoke with Anderson over the phone for about five to ten minutes (the "Phone Call"). Anderson told Schoenberger during the call that IBC had blocked the sale of Hoolahan's IBC Shares because Hoolahan had failed to disclose an outstanding $208,000 claim by ULBA (the Kazakhstan corporation) against AMS[3] (sister company to CMS, which was the forerunner to Beralcast) existing at the time of the Agreement's execution ("the ULBA/AMS claim").[4] In response, Schoenberger told Anderson that he believed the sale restriction on Hoolahan's IBC Shares violated the terms of the Agreement, and that the damages for this breach would be based upon the change in

---

[3] AMS never responded to ULBA's claim for $208,000 and ULBA was therefore awarded a default judgment against AMS in 2008.

[4] Schoenberger testified about the Phone Call during the arbitration hearing which we'll get to in short order.

- 6 -

value of Hoolahan's shares from the day Hoolahan had tried to sell them to their value at the time of the Phone Call. At the end of the call, Anderson told Schoenberger that he would send a follow-up email introducing Schoenberger to IBC's corporate counsel. Anderson did so; Schoenberger responded to the email with a CC to IBC's counsel, memorializing the Phone Call ("the Email").

In May 2013, Hoolahan (whose IBC Shares had undergone a series of "reverse stock splits"[5]) was able to sell 250,000 of his IBC Shares for $25,000, at $0.10 per share. Had Hoolahan sold all of his shares at that time (1,217,212 due to the first reverse split), he would have received a total of $121,721.

---

[5] To track the number of shares Hoolahan possessed over the course of this saga, we need to explain how IBC's shares underwent "reverse stock splits" in 2012 and 2016. "When a company completes a reverse stock split, each outstanding share of the company is converted into a fraction of a share. . . . A company may declare a reverse stock split in an effort to increase the trading price of its shares – for example, when it believes the trading price is too low to attract investors to purchase shares, or in an attempt to regain compliance with minimum bid price requirements of an exchange on which its shares trade." See Securities & Exchange Commission, Reverse Stock Splits, Investor.gov (Jan. 16, 2020), https://www.investor.gov/additional-resources/general-resources/glossary/reverse-stock-splits.

In December 2012, IBC completed a six-for-one reverse stock split, decreasing the number of Hoolahan's IBC Shares from 7,303,271 to 1,217,212. On May 23, 2016, IBC completed another reverse stock-split, this time ten-for-one, lowering Hoolahan's 967,212 shares (remaining after his May 2013 sale of 250,000 shares) to 96,721.

### D. Discovery of the IBC-Mattheson Pooling Agreement

In 2015, Hoolahan and Mattheson were engaged in litigation unrelated to the issues in this case. Discovery during that litigation, however, uncovered a Voluntary Pooling Agreement (to be explained in a moment) between IBC and Mattheson entered into on May 5, 2011 (the "IBC-Mattheson Pooling Agreement") — around the same time that Hoolahan had made his first unsuccessful attempt to sell his IBC Shares. The IBC-Mattheson Pooling Agreement permitted Mattheson to sell his IBC Shares at certain increments on an agreed-upon schedule, including between 2011 and 2012, when Mattheson made six sales for some of his IBC Shares for a total of $421,176.14.

### E. The Arbitration

Upset by Mattheson's special treatment and profit, Hoolahan filed a Demand for Arbitration with the American Arbitration Association ("AAA") asserting claims against IBC for willful and knowing breach of the Agreement and breach of the implied covenant of good faith and fair dealing for deliberately blocking Hoolahan's sale of IBC Shares.[6] Hoolahan's initial claim for damages, $1,850,162 (plus attorneys' fees, costs, and

---

[6] Hoolahan had also brought a claim under Massachusetts General Law ("M.G.L.") Ch. 93A for unfair and deceptive trade practice or fraud. The arbitrator found that the facts of the case substantiated a violation of neither M.G.L. Ch. 93A, nor the equivalent Delaware law. This issue is not on appeal.

expenses), was based on the drop in market value in Hoolahan's total IBC Shares from approximately $1,971,883.10 in 2011 to $121,721 in 2013 when he was able to make his first sale.

On April 28, 2017, a one-day arbitration was held in Boston, Massachusetts, before AAA arbitrator Robert T. Ferguson. At the hearing, Hoolahan claimed IBC deliberately blocked his sale of IBC Shares in breach of the Agreement because of the ill-will IBC harbored against Hoolahan in connection with the outstanding ULBA/AMS claim. Citing to article 2.3 of the Agreement, IBC responded that it could not breach the Agreement for failing to assist in the sale of IBC Shares because the Agreement explicitly released IBC from any such obligation. IBC also argued that it did not impermissibly block Hoolahan's sale because it was legally entitled to restrict the sale of IBC Shares in the U.S., and that Hoolahan was free to sell on the Canadian TSX Exchange four months and one day after the Agreement was executed.

During the hearing, attorney Schoenberger (appearing only as a witness; Hoolahan was represented by other counsel during the hearing) walked the arbitrator through his 2012 Phone Call and Email with Anderson. Anderson was originally scheduled to testify by videoconference, but was unavailable due to a death in the family. As IBC's counsel attempted to make a proffer of what would have been provided by Anderson, Hoolahan's counsel objected. Then the following exchange ensued:

**IBC COUNSEL**: I will if, in fact, we have -- we don't have Mr. Anderson here due to the death of his father, so it's -- and he wouldn't have been here anyway. It would have been by video conference due to his physical condition, but, that said, I would be more than happy to solicit from him an affidavit.

**HOOLAHAN COUNSEL**: Oh, no, no.

**ARBITRATOR FERGUSON**: I'd prefer to see him.

**HOOLAHAN COUNSEL**: There will be no affidavits. He's got to be . . . here and examined and cross-examined.

**ARBITRATOR FERGUSON**: We can schedule a deposition if you'd like.

**HOOLAHAN COUNSEL**: Today is the hearing.

**ARBITRATOR FERGUSON**: If there's an objection to that, today's the hearing.

**IBC COUNSEL:** If he's objecting, I can petition.

**HOOLAHAN COUNSEL**: Today's the hearing date.

**HOOLAHAN**: This is insane.

**ARBITRATOR FERGUSON**: Continue.

**IBC COUNSEL**: If I could continue, so the fact of the matter is that this[7] is Mr. Anderson's testimony and what has been set forth by Mr. Schoenberger here, I think, is really at the crux of this dispute.

Neither party raised the option of postponing the hearing, nor did IBC raise the Anderson affidavit again.[8]

The Phone Call and Email between Schoenberger and Anderson were central to Hoolahan's claims in arbitration because

---

[7] It appears from the record that IBC's counsel here was referring to the theoretical testimony of Mr. Anderson, and not any actual affidavit he had on hand.

[8] Hoolahan tells us that IBC knew of Anderson's unavailability before the hearing and wrote in an email dated three days before the hearing that it would not be requesting a postponement. But because IBC first raised the issue of postponement on appeal, we need not delve into the significance — or, lack thereof — of this email.

it was the only evidence of IBC admitting that it had blocked Hoolahan's 2011 sale, and why.  During arbitration, IBC objected to the admission of the Email and to Schoenberger's testimony about the Phone Call as violative of Rule 4.2 of the Ohio Rules of Professional Conduct (Schoenberger is licensed to practice in Ohio), which prohibits an attorney from directly communicating with a represented party.[9]  Schoenberger maintained that he was unaware that IBC or Anderson was represented by counsel in this dispute until the end of the Phone Call.  At the end of the hearing, the arbitrator again acknowledged IBC's objection to Schoenberger's testimony and asked the parties to "justify their positions" in post-hearing briefing as to the inclusion or exclusion of the Phone Call and Email.

---

[9] "In representing a client, a lawyer shall not communicate with a person the lawyer knows to be represented by another lawyer in the matter . . . ."  Ohio R. Prof'l Conduct (Prof. Cond. Rule 4.2).  "In the case of a represented organization, this rule prohibits communications with a constituent of the organization who . . . has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability."  Id. at cmt. 7.  "The prohibition on communications with a represented person applies only in circumstances where the lawyer knows that the person is in fact represented in the matter to be discussed.  This means that the lawyer has actual knowledge of the fact of the representation; but such *actual knowledge may be inferred from the circumstances*. See Rule 1.0(g).  Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by closing eyes to the obvious."  Id. at cmt. 8 (emphasis added).

During his closing statement, IBC's counsel speculated about the reason Hoolahan was unable to complete his 2011 sale of IBC Shares, guessing that Hoolahan's broker was "not a registered broker-dealer on the Toronto broker exchange" or that "a U.S. person" had been "identified [as] a buyer." Hoolahan's counsel leaped to point out that there was no evidence to back up these speculations. Then IBC's counsel said, seemingly off-the-cuff, "we would freely admit there was ill will between Mr. Hoolahan and IBC[.]"

After the arbitration hearing Hoolahan submitted via email[10] a revised damages calculation "based upon the '[IBC-Mattheson] Pooling Agreement,'" lowering his ask from $1,850,162.00 to $1,239,737.56, plus attorneys' fees, costs, and expenses.[11]

### F. The Award and Ensuing Litigation

On September 8, 2017, the arbitrator entered a final arbitration award (the "Award") and found that IBC had: (1) denied Hoolahan the benefit of his contractual bargain by blocking his sale and deliberately breaching articles 13.3 and 13.9 of the Agreement, and (2) breached the implied covenant of good faith and

---

[10] The email making this request is not in the record.

[11] Hoolahan refers to "two damages-only submissions to the Arbitrator" in his brief, but does not cite to those documents in the record; nor could we locate them.

fair dealing. The arbitrator explained that IBC's admission of ill-will towards Hoolahan and the disparity in treatment between Hoolahan and Mattheson, as evinced by the IBC-Mattheson Pooling Agreement, "amount[ed] to a per-se [sic] violation [of the Agreement] and leaves no doubt that [IBC] acted in bad faith and deliberately denied [Hoolahan] the benefit of the bargain [he] was entitled to under the Agreement." The arbitrator further explained that "the timing of the grievance, the facts of the case, the evidence as offered and the live testimony at the Hearing concern[ing] [IBC]'s admitted '*ill-will*' towards [Hoolahan]" all supported a finding of breach of the implied covenant of good faith and fair dealing. He accepted Schoenberger's testimony as "credible, stand-alone evidence" and noted that IBC did not offer any "[w]itness, deposition or other evidence to contradict Attorney Schoenberger's live testimony." He excluded the Email as "technically irrelevant" and cumulative of Schoenberger's testimony.

The arbitrator awarded Hoolahan damages in the amount requested, $1,239,737.56, plus attorneys' fees, costs, and expenses in the amount of $135,786.76. The damages figure was calculated by applying Hoolahan's original, total 2011 shares (7,303,271) to the stock value Mattheson had received on his sales made in accordance with the IBC-Mattheson Pooling Agreement. The arbitrator did not explicitly offset the Award by the profit

Hoolahan had made from his 2013 sale of 250,000 IBC Shares, nor by the value of the 96,721 IBC Shares Hoolahan still held at the time of the Award.

Within twenty days of the Award's issuance, IBC filed a Request to Modify the Award, pursuant to AAA Commercial Rule R-50. IBC for the first time contended that the Award should be discounted by the 96,721 IBC Shares Hoolahan retained at the time of the Award, and that because Mattheson had been able to sell only 32.7% of his shares under the IBC-Mattheson Pooling Agreement, the damages portion of the Award should have been 32.7% of $1,239,737.56.[12] IBC also raised the fact that "IBC's essential witness Simon Anderson was denied the opportunity to be heard," but did not explain why what Anderson had to say might alter the Award.[13] Finally, IBC appended to its Request an affidavit from Mattheson describing the IBC-Mattheson Pooling Agreement. The arbitrator denied the Request.

On October 11, 2017, Hoolahan filed a Petition to Confirm the Award in U.S. District Court for the District of Massachusetts. Conversely, IBC filed a Petition to Vacate the Award. District

---

[12] Oddly enough, IBC did not ask in its Request to Modify that the Award also be discounted by Hoolahan's proceeds from his 2013 sale of 250,000 IBC shares.

[13] IBC also requested that the arbitrator account for the cash consideration Hoolahan had received under the Agreement when adjusting the Award. IBC does not raise this issue on appeal.

Judge O'Toole entered an order confirming the Award on March 27, 2019.  IBC now appeals to this court asking us to vacate the district court's order confirming the award, or, at a minimum, remand this case so that the district court can return the matter to arbitration for a rehearing on damages.

## II.   DISCUSSION

Against this factual backdrop, IBC asks this court to find that the arbitrator misinterpreted the Agreement, ignored essential evidence, and considered impermissible evidence, all to lead us to the conclusion that the Award should be vacated, or at the very least modified.  The burden rests upon IBC "to establish that the arbitrator's award should be set aside."  Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 932 F.3d 1, 7 (1st Cir. 2019) (citing Ortiz-Espinosa v. BBVA Sec. of Puerto Rico, Inc., 852 F.3d 36, 48 (1st Cir. 2017)).

### A. Standard of Review

Generally, we review the district court's decision to confirm or vacate an arbitration award de novo, Dialysis Access Ctr., 932 F.3d at 7 (citing Ortiz-Espinosa, 852 F.3d at 47); see also Cytyc Corp. v. DEKA Prods. Ltd. P'ship, 439 F.3d 27, 32 (1st Cir. 2006), but we do so with great circumspection:  "[a] federal court's authority to defenestrate an arbitration award is extremely limited."  Mt. Valley Prop., Inc. v. Applied Risk Servs.,

- 15 -

Inc., 863 F.3d 90, 93 (1st Cir. 2017) (quoting First State Ins. Co. v. Nat'l Cas. Co., 781 F.3d 7, 11 (1st Cir. 2015)).

Though we have a robust record before us, including the full transcript from the one-day arbitration hearing, the Agreement, and the Award, we remain mindful that in reviewing an arbitration award, "[w]e do not sit as a court of appeal to hear claims of factual or legal error by an arbitrator or to consider the merits of the award." Asociación de Empleados del E.L.A. v. Unión Internacional de Trabajadores de la Industria de Automóviles, 559 F.3d 44, 47 (1st Cir. 2009) (quoting Challenger Caribbean Corp. v. Unión Gen. de Trabajadores de P.R., 903 F.2d 857, 860 (1st Cir. 1990)); see also Advest, Inc. v. McCarthy, 914 F.2d 6, 8 (1st Cir. 1990) (quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987)).

In reviewing the arbitrator's interpretation of the Agreement, for example, as long as the Award "draw[s] its essence" from the Agreement that underlies the arbitration proceeding, Cytyc Corp., 439 F.3d at 32 (quoting United Paperworkers Int'l Union, 484 U.S. at 38), and the arbitrator "arguably constru[ed] or appl[ied] . . . the [Agreement] within the scope of [his] authority," id., we will not disturb the Award. "That a reviewing court is convinced that the arbitrator[] committed error — even serious error — does not justify setting aside the arbitral decision." Id. "This remains true whether the arbitrators'

- 16 -

apparent error concerns a matter of law or a matter of fact." Id.
(quoting Advest, Inc., 914 F.2d at 8); see also Dialysis Access
Ctr., 932 F.3d at 9 (adding that "our limited review applies
'[e]ven where such error is painfully clear, [because] courts are
not authorized to reconsider the merits of arbitration awards'"
(quoting Advest, 914 F.2d at 8)).

All that said, arbitration awards are not invincible,
and there are "a few exceptions to the general rule that
arbitrators have the last word." Cytyc Corp., 439 F.3d at 32-33.
"One set of exceptions is codified in the Federal Arbitration Act
(FAA). The operative provision, section 10(a) of the FAA,
authorizes vacatur only in cases of 'specified misconduct or
misbehavior on the arbitrators' part, actions in excess of arbitral
powers, or failures to consummate the award.'" Id. (citing Advest,
914 F.2d at 8). "A second set of exceptions flows from the federal
courts' inherent power to vacate arbitral awards," id. (citing
Advest, 914 F.2d at 8), in the event of a "manifest disregard of
the law." Advest, 914 F.2d at 8-10 & nn.5, 6. This power outside
of section 10(a) of the FAA is nonetheless very limited and narrow.
Cytyc Corp., 439 F.3d at 33; Advest, 914 F.2d at 7-8.[14]

_____

[14] The availability of non-statutory grounds to vacate an
arbitration award is in question in light of the Supreme Court's
decision Hall Street Assoc.'s, L.L.C. v. Mattel, Inc., 552 U.S.
576, 584-590 (2008) (stating "the text compels a reading of the §§
10 and 11 categories [of the FAA] as exclusive"). But "this court
has avoided answering the question and instead has assumed its

- 17 -

We begin our analysis with IBC's statutory arguments and conclude with the common law.

## B. The Merits

### i. Section 10(a) of the Federal Arbitration Act

The FAA's central purpose is to ensure that "private agreements to arbitrate are enforced according to their terms." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 682 (2010) (citations omitted). Congress passed the FAA to make written arbitration provisions or agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; Stolt-Nielsen S.A., 559 U.S. at 682. There are four circumstances where a court may vacate an arbitration award under the FAA:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a

---

continued application when no manifest disregard of the law [has] occurred," Dialysis Access Ctr., 932 F.3d at 13 n.13 (citing Mt. Valley Prop., Inc., 863 F.3d at 94). Therefore, like in Dialysis Access Ctr., since we find no manifest disregard of the law, we "continue to leave that question for another day." Id.

- 18 -

> mutual, final, and definite award upon the
> subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4).  IBC argues that three of these circumstances (a couple debuted for the first time on appeal) exist here, asserting that vacatur is warranted because:  the Award was procured by undue means due to reliance on Schoenberger's testimony, see id. at § 10(a)(1); the arbitrator was guilty of misconduct in refusing to postpone the hearing and accept an affidavit from IBC's Anderson to rebut Schoenberger's testimony, see id. at § 10(a)(3); and the arbitrator exceeded his powers in awarding attorneys' fees and imposing a nonexistent contractual obligation on IBC, see id. at § 10(a)(4).

### a. **9 U.S.C. § 10(a)(1)**

IBC argues that the Award should be vacated because it was "procured by . . . undue means." 9 U.S.C. § 10(a)(1).  So let us first explore that concept.  This court examined a claim for vacatur on the basis of undue means for the first time in Nat'l Cas. Co. v. First State Ins. Grp., 430 F.3d 492, 499 (1st Cir. 2005).  In doing so, it took out-of-circuit guidance[15] and found

---

[15] See PaineWebber Group, Inc. v. Zinsmeyer Trusts P'ship, 187 F.3d 988, 991 (8th Cir. 1999) (reversing finding of undue means where petitioner failed to prove that respondent's alleged misconduct in the discovery process was intentional or that it procured the award); Am. Postal Workers Union, AFL–CIO v. U.S. Postal Serv., 52 F.3d 359, 362 (D.C. Cir. 1995) (declining to find undue means where respondent introduced arrest record contrary to state law because undue means requires action equivalent in gravity to fraud or corruption).  After our decision in Nat'l Cas. Co.,

- 19 -

that "[t]he best reading of the term 'undue means' . . . is that it describes underhanded or conniving ways of procuring an award that are similar to corruption or fraud, but do not precisely constitute either." See id. (explaining that there must be "intentional malfeasance" to justify vacating an arbitral award). Ultimately, this court affirmed the award in Nat'l Cas. Co. in favor of appellee, finding that appellee's refusal to produce documents, in light of which the arbitrator had drawn a negative inference against appellee, did not amount to "undue means" where such conduct did not "amount[] to the kind of intentional malfeasance that justifies vacatur under the statute." Id.

IBC's "procured by undue means" contention is predicated on the alleged ethically-improper testimony of Schoenberger, Hoolahan's attorney, who, you'll remember, directly called IBC's CFO Anderson to inquire about Hoolahan's inability to sell his shares, and testified during the arbitration that he learned only at the end of the Phone Call that IBC was represented by counsel. Essentially, IBC argues that but for the arbitrator's reliance on the communication between Schoenberger and Anderson that IBC contends violated the Ohio Rules of Professional Conduct, the

---

the Fourth Circuit in MCI Constructors, LLC v. City of Greensboro also declined to find that the respondent procured an award by undue means by referencing evidence outside of the record because the petitioner did not show the references influenced the arbitrator's decision. 610 F.3d 849, 858-59 (4th Cir. 2010).

arbitrator would have no evidence of "'ill-will' as the basis for his finding that IBC breached the implied covenant of good faith and fair dealing."  Hoolahan responds that Schoenberger's testimony was admissible, as the arbitrator so found, because Schoenberger did not know that IBC had legal representation when he initiated the call and thus violated no ethical rules.

Our take:  IBC is unable to show that Schoenberger's testimony constituted conduct amounting to "intentional malfeasance."  <u>See</u> <u>id.</u>  The arbitrator determined that Schoenberger's conduct did not violate the Ohio Rules of Professional Conduct,[16] as he found to be truthful and credible Schoenberger's testimony that he was unaware IBC was represented by counsel until the end of the Phone Call with Anderson.  As we have no basis to discredit this finding, IBC's argument cannot stand.

And even if the arbitrator's reliance on Schoenberger's testimony did constitute reliance on undue means (which we do not believe it does), IBC also fails to show that Schoenberger's testimony procured the award.  The arbitrator explained in his Award that his finding of "ill-will" rested on "the timing of the grievance, the facts of the case, the evidence as offered" — not

_____

[16] And we need not address here what we would do if Schoenberger's conduct was determined to have violated the Ohio Rules of Professional Conduct, and how such a violation would interact with the other rules and law governing the Agreement.

solely on Schoenberger's testimony.[17]  See PaineWebber, 187 F.3d at 994-95 (finding no undue means, even assuming that the respondent intentionally and incorrectly asserted privilege over documents in discovery, because there was no proof that the error "procured" the award).

Taking this all in, we find that IBC has failed to show that the award was procured by a reliance on undue means and should be vacated under 9 U.S.C. § 10(a)(1).

### b. 9 U.S.C. § 10(a)(3)

IBC also argues that the arbitrator's refusal to postpone the hearing or permit the submittal of an affidavit from IBC's Anderson amounts to misconduct warranting vacatur under 9 U.S.C. § 10(a)(3).  Section 10(a)(3) of the FAA lists three separate grounds for vacatur:  "[w]here the arbitrators were guilty of misconduct in [1] refusing to postpone the hearing, upon sufficient cause shown, or [2] in refusing to hear evidence pertinent and material to the controversy; or [3] of any other misbehavior by which the rights of any party have been prejudiced."

---

[17] And let's not forget that counsel for IBC himself stated during the hearing:  "we would freely admit there was ill will between Mr. Hoolahan and IBC" — a statement that the arbitrator relied upon in the Award to find IBC's "admission of 'ill-will' towards" Hoolahan.  See Lima v. Holder, 758 F.3d 72, 79 (1st Cir. 2014) ("'[A]n admission of counsel during trial is binding on the client' if, in context, it is 'clear and unambiguous.'") (quoting Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 134 (1st Cir. 1997)).

- 22 -

9 U.S.C. § 10(a)(3).  IBC advances arguments based on the first and second grounds.

IBC's first gripe is that the arbitrator did not postpone the hearing to allow for later testimony from Anderson, and its second that the arbitrator's refusal to admit into evidence an affidavit from Anderson amounted to a "refus[al] to hear evidence pertinent and material to the controversy."  9 U.S.C. § 10(a)(3).  IBC concedes that it raised neither of these arguments during the hearing.  IBC never even asked for a postponement, and after the arbitrator denied the admission of an affidavit, IBC did not object to the denial, and it did not offer any reason or argument as to why the affidavit was admissible or how IBC was prejudiced.  Nor did IBC raise these arguments before the district court.  It raises them for the first time in its opening appeal brief.

Hat in hand and acknowledging its failure to preserve its section 10(a)(3) arguments, IBC assumes that this court "will not consider issues not raised below" and therefore urges this court to review these arguments de novo as "exceptional" ones.  But that is not how we handle arguments raised for the first time on appeal.  Arguments "debuted on appeal" are deemed "forfeited" and therefore engender plain error review.  Nat'l Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70, 85 (1st Cir. 2018) (citing McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir.

1991) and Dávila v. Corporación De P.R. Para La Difusión Pública, 498 F.3d 9, 14 (1st Cir. 2007)).

"Plain error requires appellants to demonstrate: '(1) an error occurred (2) which was clear or obvious . . . (3) affected [his] substantial rights [and] (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings.'" Nat'l Fed'n of the Blind, 904 F.3d at 85 (quoting Dávila, 498 F.3d at 14-15). IBC's first argument, that the arbitrator's failure to postpone the hearing (without being asked) warrants vacatur of the Award, fails under this standard as IBC "cites no authority that mandates such a sua sponte [i.e., of the arbitrator's own accord] continuance [another word for "postponement"]." See United States v. Scott, 877 F.3d 42, 51 (1st Cir. 2017), cert. denied, 139 S. Ct. 65 (2018). Therefore, "[w]ith no authority suggesting such a continuance was required, there was no 'clear or obvious' error, and thus [IBC] cannot succeed on plain error review." Id.

Next, we apply plain error review to IBC's contention that the arbitrator's refusal to admit into evidence an affidavit from Anderson amounted to a "refus[al] to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3); cf. Correia v. Feeney, 620 F.3d 9, 15 (1st Cir. 2010) (applying plain error review to the district court's admission of evidence where the specific objection to the admission was not raised with the

district court and finding none). IBC essentially complains that the arbitrator's reliance on Schoenberger's testimony without hearing testimony from Anderson to rebut it was error warranting vacatur of the Award: "[i]n view of the importance of Schoenberger's unrebutted testimony to the arbitrator's final decision on the merits, the arbitrator's refusal to either permit an affidavit from Anderson or hold the record open so that Anderson's testimony could be taken via deposition or videoconference at a later date deprived IBC of a fair hearing. This misconduct fits squarely within the FAA's grounds for vacatur." This argument borders on the absurd. Knowing full well in advance that Anderson would be unavailable to testify, IBC never asked for a continuance (nor did it think to prepare an affidavit ahead of the hearing to at least offer as evidence). On the other hand, Hoolahan's witness, attorney Schoenberger, was available and subject to cross, such that the arbitrator could hear from him, make a credibility determination, and render a decision based on all the evidence he deemed admissible. Under these circumstances, we see no error, plain or otherwise, in the arbitrator's decision to forgo an affidavit from Anderson. Cf. Long v. Fairbank Reconstruction Corp., 701 F.3d 1, 5 (1st Cir. 2012) (rejecting appellant's argument raised for the first time on appeal that the district court erred in admitting an expert's video deposition where the court subsequently discredited a report the expert had

relied upon, finding that because the expert had "relied on many sources" outside that report, "the district court did not err — let alone plainly err — in admitting the video").

And so we stop there.  We find that IBC has failed to convince us that vacatur of the Award under 9 U.S.C. § 10(a)(3) is warranted.

### c. 9 U.S.C. § 10(a)(4)

IBC's last statutory argument is that the arbitrator misinterpreted the Agreement, leading him to "exceed[] [his] powers" under 9 U.S.C. § 10(a)(4) in two ways,[18] by:  (1) awarding Hoolahan attorneys' fees, and (2) disregarding a provision in the Agreement that disclaimed IBC's obligation to assist Hoolahan in reselling his IBC Shares.  IBC did not raise the first argument before the district court,[19] and while it did raise the second one below, thus preserving its challenge, the district court did not

---

[18]  In the summary of its argument, IBC contends that "award[ing] a windfall to Hoolahan" by not discounting the Award by Hoolahan's 2013 sale and remaining IBC Shares was also an instance of the arbitrator exceeding his authority under 9 U.S.C. § 10(a)(4).  However, IBC develops this specific point no further in its brief, and therefore we find this angle of IBC's section 10(a)(4) argument waived.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[19] Attorneys' fees came up only tangentially, at best, during arbitration.

- 26 -

rule on it.  For his part, Hoolahan does not address either argument in his brief.[20]

IBC's failure to raise the issue of attorneys' fees below (during arbitration or in front of the district court) would ordinarily trigger plain error review as just discussed.  Nat'l Fed'n of the Blind, 904 F.3d at 85.  But because Hoolahan does not advocate for plain error review and the highly-deferential de novo review of an arbitration award is nearly as demanding as plain error review, see, e.g., Díaz-Fonseca v. Puerto Rico, 451 F.3d 13, 36 (1st Cir. 2006) ("The [plain error] standard is high, and 'it is rare indeed for a panel to find plain error in a civil case.'") (quoting Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002)), such that the outcome will in this case be the same under either standard, we will review this issue de novo as well, see United States v. Tapia-Escalera, 356 F.3d 181, 183 (1st Cir. 2004) (reviewing de novo where the appellee did not argue for a plain error standard), albeit with the deference required.

---

[20] Hoolahan's failure to rebut IBC's section 10(a)(4) arguments raises the issue of appellee waiver, which we have not confronted head-on in this circuit before.  See, e.g., W. Virginia Coal Workers' Pneumoconiosis Fund v. Bell, 781 F. App'x 214, 226 (4th Cir. 2019).  But we exercise our discretion, see Guillemard-Ginorio v. Contreras-Gomez, 585 F.3d 508, 517-18 (1st Cir. 2009), to bypass the issue of appellee waiver and leave the ramifications for another day, particularly because we will analyze IBC's arguments under a de novo standard (we'll explain in a minute) and therefore discern no unfairness towards IBC here.

Like IBC's other theories for vacatur, its section 10(a)(4) one faces a precipitous incline: "[a]bsent a strong implication that an arbitrator exceeded his or her authority, the arbitrator is presumed to have based his or her award on proper grounds." Dialysis Access Ctr., 932 F.3d at 11 (quoting Labor Relations Div. of Constr. Indus. v. Int'l Bhd. of Teamsters, Local #379, 29 F.3d 742, 747 (1st Cir. 1994)). Once again, we remember that "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." United Paperworkers Int'l Union, 484 U.S. at 38. Under section 10, we "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts," and "[e]ven where such error is painfully clear, courts are not authorized to reconsider the merits of arbitration awards." Advest, 914 F.2d at 8 (internal quotation marks omitted).

## 1. Attorneys' Fees

IBC argues that the arbitrator exceeded his authority by awarding attorneys' fees to Hoolahan in contravention of the rules and law governing the Agreement: the AAA Commercial Rules and Delaware state law. IBC notes that the AAA Commercial Rules do not permit an award of attorneys' fees unless requested by all parties or otherwise authorized by law or the arbitration

- 28 -

agreement.  And IBC argues that because Delaware follows the "'American Rule,' whereby a prevailing party is generally expected to pay its own attorneys' fees and costs," Hoolahan was not entitled to attorneys' fees.[21]

Our task here is to follow the "cardinal principle of contract construction[] that a document should be read to give effect to all its provisions and to render them consistent with each other." Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995).  See also Dialysis Access Ctr., 932 F.3d at 11-12.

Rule 47 of the AAA Commercial Rules permits an arbitrator to award attorneys' fees under three circumstances:  "if [1] all parties have requested such an award or [2] it is authorized by law or [3] their arbitration agreement."[22]  Here, there is no indication on the record that circumstance one (that both parties requested attorneys' fees) or three (that the Agreement itself explicitly allows for an award of attorneys' fees) is present.  So we therefore turn to the law governing the Agreement:  Delaware.

---

[21]  In its opening appeal brief, IBC explains that Massachusetts law also follows the "American Rule," but provides no argument as to why Massachusetts, and not Delaware, law should apply here.

[22] American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures (2013), available at https://adr.org/sites/default/files/CommercialRules_Web_FINAL_2.pdf.

- 29 -

While IBC is correct that under Delaware law the winning party is "generally expected to pay its own attorney's fees and costs," that expectation is subject to certain "limited equitable exceptions," such as "bad faith." <u>Montgomery Cellular Holding Co. v. Dobler</u>, 880 A.2d 206, 227 (Del. 2005).

> Although there is no single, comprehensive definition of 'bad faith' that will justify a fee-shifting award, Delaware courts have previously awarded attorneys' fees where (for example) 'parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims.' The bad faith exception is applied in 'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the judicial process.

<u>Id.</u> Delaware law "departs from the American Rule and may shift fees where the 'underlying (prelitigation) conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages,'" <u>Auriga Capital Corp.</u> v. <u>Gatz Properties</u>, 40 A.3d 839, 881 n.183 (Del. Ch. 2012) (listing numerous instances where Delaware courts have awarded attorneys' fees), <u>aff'd</u>, 59 A.3d 1206 (Del. 2012), and IBC points to no authority — nor could we find any — that Delaware law forbids arbitrators from awarding attorneys' fees. <u>See, e.g.</u>, <u>Roncone</u> v. <u>Phoenix Payment Sys., Inc.</u>, No. C.A. No. 8895-VCN, 2014 WL 6735210, at *5 (Del. Ch. Nov. 26, 2014) (finding that "the arbitrator acted within his authority also to award Roncone his attorneys' fees and costs").

Here, the arbitrator's finding of IBC's "bad faith" cleared the way for an award of attorneys' fees. The arbitrator stated in his Award that "[IBC's] admission of 'ill-will' towards [Hoolahan], coupled with the disparity of treatment afforded to [Hoolahan] when compared to the treatment afforded to Mr. Mattheson, in my view amounts to a per-se [sic] violation and leaves no doubt that [IBC] acted in *bad faith* and deliberately denied [Hoolahan] the benefit of the bargain [he] was entitled to under the Agreement." (Emphasis added.) He therefore found and noted in the Award that "due to the willful nature of the contract breaches and the subsequent admission of same by [IBC], [Hoolahan]'s request for attorney's fees, costs and expenses are also granted . . . ." That the arbitrator decided to take the evidence in front of him that amounted to the existence of "ill-will" to impute "bad faith" onto IBC, and as a result award attorneys' fees, cannot be reasonably viewed as in excess of his power. See, e.g., Prudential-Bache Sec., Inc. v. Tanner, 72 F.3d 234, 242-43 (1st Cir. 1995) (declining to find that the arbitrator had exceeded his authority under section 10(a)(4) in awarding attorneys' fees where Puerto Rico law permitted the award of such fees "against a party which raises and obstinately pursues meritless claims or otherwise vexatiously engages in unnecessary litigation," and "the [arbitration] panel had evidence in front of it as to obstinate or frivolous conduct"); see also Asociación de

<u>Empleados del E.L.A.</u>, 559 F.3d at 47. IBC has therefore failed to show that the arbitrator violated 9 U.S.C. § 10(a)(4) when he awarded Hoolahan attorneys' fees in accordance with Delaware law.

2. <u>IBC's Obligation to Help Hoolahan Resell</u>

Next, IBC argues that the arbitrator exceeded his authority by misinterpreting the Agreement when he found that article 13.3[23] governed the obligation that IBC had breached, rather than the more specific article 2.3(e)(ii),[24] which disclaims any obligations IBC has to help Hoolahan resell his shares. IBC contends that under basic principles of contract interpretation, specific language in a contract controls over general language where they conflict, the arbitrator should not have disregarded article 2.3(e)(ii), and, in doing so, the arbitrator's interpretation ran afoul of the contract's plain language.

Now remember, "[a]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed

_____

[23] **Article 13.3:** "From and after the date of this Agreement, as may be necessary, the Parties shall execute, acknowledge and deliver such other instruments and take such other action as may be reasonably necessary to carry out their obligations under this Agreement."

[24] **Article 2.3(e)(ii):** "IBC has no obligation under any circumstances to register the IBC shares or to take any other actions to facilitate or permit any resale or transfer thereof in the United States or otherwise by or to a U.S. Person and will certify same to the Vendors."

serious error does not suffice to overturn his decision." United Paperworkers Int'l Union, 484 U.S. at 38. A showing that the arbitrator made a serious error is not sufficient. Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569 (2013) (citing Stolt-Nielsen S.A., 559 U.S. at 674-675). Rather, a court may overturn a decision "only if 'the arbitrator acts outside the scope of his contractually delegated authority' — issuing an award that 'simply reflects his own notions of economic justice' rather than 'drawing its essence from the contract.'" Id. (quoting Eastern Associated Coal Corp. v. United Mine Workers of Am., 531 U.S. 57, 62 (2000)(cleaned up)).

Even if IBC is right that the arbitrator did not *correctly* interpret the Agreement, he nonetheless interpreted it. And that is enough. Compare Oxford Health, 569 U.S. at 569–70 (explaining that arbitrators do not exceed their authority as long as they interpret, even arguably, relevant contractual provisions), with Stolt-Nielsen S.A., 559 U.S. at 674-75 (finding panel exceeded authority in concluding agreements allowed for class arbitration where the clauses were silent on the issue and the panel failed to examine whether the FAA or state law provided a default rule). The specific article that IBC seeks to advance and argues that the arbitrator ignored (article 2.3(e)(ii)) was raised multiple times in front of the arbitrator during the arbitration hearing, so much so that the article was even read

aloud in full by a live witness. And the Award itself cites to articles from the Agreement. Taken together, this is more than enough for this court to conclude that the arbitrator construed the Agreement, and as such did not exceed his authority when he concluded that IBC had breached the Agreement. See, e.g., First State Ins. Co. v. Nat'l Cas. Co., 781 F.3d at 11 (finding the arbitrator to have construed the underlying contracts where the text of the arbitral award referred to the contracts themselves); Cytyc Corp., 439 F.3d at 33 (affirming the arbitrators' decision where the "panel's decision . . . ma[de] manifest that the arbitrators pondered the pertinent language of the Agreement and construed that language in accordance with the parties' discernible intent" (internal citations omitted)).

IBC has therefore also failed to show that the arbitrator exceeded his authority under 9 U.S.C. § 10(a)(4) when he found article 13.3, not article 2.3(e)(ii), to be breached.

### ii. Manifest Disregard of the Law

In addition to its statutory arguments, IBC also claims that the arbitrator acted with "manifest disregard of the law" when he failed to offset Hoolahan's Award with 1) the proceeds from Hoolahan's 2013 sale of 250,000 IBC Shares[25] and 2) the value

---

[25] It appears that IBC is raising this specific miscalculation for the first time on appeal. But it is of no matter here, since we find that the argument regarding this miscalculation is already waived for other reasons. Stay tuned.

of the shares Hoolahan retained at the time of the Award. According to IBC, this miscomputation gave Hoolahan an impermissible "windfall" in "duplicative damages," and was made in "manifest disregard of the law." Hoolahan responds that IBC's challenges to the Award are waived because IBC never raised the issue of a "windfall" in any submissions to the arbitrator before the Award. Bypassing Hoolahan's waiver argument, IBC again cannot succeed on the merits.[26]

Assuming its ongoing viability, the common law doctrine of "manifest disregard of the law" "allows courts a very limited power to review arbitration awards outside of section 10 [of the FAA]." Dialysis Access Ctr., 932 F.3d at 12-13 (citing Mt. Valley Prop., Inc., 863 F.3d at 94). Under this doctrine, a court may vacate an award that is "(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group

---

[26] Because we find that IBC has waived its arguments as to the first two grounds under the manifest disregard of the law doctrine for reasons other than its failure to raise them before the Award issued, and because we can address the third ground on the merits to affirm the Award, we need not decide whether IBC waived its "windfall" argument by not raising it in front of the arbitrator until after the Award issued. See United States v. Parker, 872 F.3d 1, 14 (1st Cir. 2017) ("Because we can uphold the judge's willful-blindness charge on the merits, we need not decide whether Parker waived the issue because of inadequate briefing."), cert. denied, 138 S. Ct. 936 (2018); United States v. Parrilla Bonilla, 626 F.2d 177, 179 (1st Cir. 1980) ("We need not decide whether appellants' not having raised certain issues until after trial constituted waiver since we resolve the issues on the merits adversely to appellants.").

of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact."  Mt. Valley Prop., Inc., 863 F.3d at 95 (quoting McCarthy v. Citigroup Glob. Mkts., Inc., 463 F.3d 87, 91 (1st Cir. 2006)).

IBC dresses its miscomputation grievance as three separate grounds for vacatur under this doctrine:  1) the miscomputation makes the Award "unfounded in reason and fact"; 2) no other judge would have made such a miscomputation; and 3) the miscomputation results from reliance on a "non-fact" — the "assumption that Hoolahan no longer owned any shares" at the time of the Award.

As to grounds one and two, IBC cites no case law to support its contentions that the Award is "unfounded in reason and fact" and that "no judge" would have made the purported miscomputation.  For ground one, IBC criticizes the arbitrator's math for not discounting the Award by the value of the shares Hoolahan still retained at the time of the Award, and for assuming that Hoolahan would have been able to sell all his shares when Mattheson had, rather than the fraction of total shares that Mattheson actually sold in 2011.  And for ground two, IBC simply states that "no judge would [have made] the above-described computational error in awarding damages," and the decision was "so mangled by faulty reasoning that it awards a double-recovery."

- 36 -

But IBC offers no more in the way of argument to persuade us that either is a ground for vacating the Award. "Ultimately, not having done the legwork we require to develop this position, [IBC] has waived those challenges." Dialysis Access Ctr., 932 F.3d at 12 (citing Rodríguez v. Municipality of San Juan, 659 F.3d 168, 176 (1st Cir. 2011); Holloway v. United States, 845 F.3d 487, 491 n.4 (1st Cir. 2017); Zannino, 895 F.2d at 17 (stating that litigants must develop their own arguments rather than "leaving the court to do counsel's work")).

As for ground three, IBC relies on only one case in support of its "non-fact" argument, that the arbitrator "inaccurately assumed that Hoolahan no longer owned any shares [at the time of the Award], when in fact he still held 96,721." In Electronics Corp. of America v. Int'l Union of Elec., Radio and Mach. Workers, AFL-CIO Local 272, the sole basis of the arbitrator's award was premised on a mistaken belief (underscored by claimant's poor presentation of the facts) that an employee had not been suspended prior to termination and had therefore been denied "industrial due process" under a progressive discipline system. 492 F.2d 1255 (1st Cir. 1974). On appeal this court found that the employee's prior suspension had been presented to the arbitrator (albeit not so clearly), and so vacated the award. Id. Electronics Corp. is inapposite here because there exists no equivalent "non-fact." There is no indication from the record

- 37 -

that the arbitrator ever assumed that Hoolahan held no shares at the time of the Award. Rather, the record shows that the arbitrator was made aware multiple times during the hearing and through written submissions that Hoolahan still retained a certain number of shares at the time of the Award. IBC even concedes as much in its opening brief.[27] Just because the arbitrator did not specifically call out the IBC Shares still held by Hoolahan in the Award does not mean that the arbitrator did not consider that evidence or "erred in his view of the facts." Electronics Corp., 492 F.2d at 1257. The arbitrator was not required to tell us any more about how he accounted for the shares Hoolahan still retained. Cytyc Corp., 439 F.3d at 34 ("Arbitrators are not required to provide particularized reasons for their decisions. It follows that an arbitrator's failure to comment upon a specific piece of evidence cannot support an inference that he failed to consider it." (internal citations omitted)). We therefore find that IBC has not made a showing that the arbitrator acted in "manifest disregard of the law" when deciding the Award.

---

[27] "[I]t was clear from the arbitration record that Mr. Hoolahan had *not* sold all of his shares. There was testimony and argument throughout the arbitration hearing that Mr. Hoolahan sold only 250,000 of his 1,217,212 post-split shares, and this was even one of the stipulated facts at the hearing. . . . There were neither any stipulated facts nor any testimony about any other sales by Mr. Hoolahan."

## III. CONCLUSION

All told, IBC's "argument reduces to a frontal attack on the merits of the arbitral award." Id. at 35. But "[s]uch an attack is easily repulsed. It was the province of the arbitrator[] to scrutinize the language of the Agreement, weigh the conflicting evidence of the parties' intentions, and determine the dimensions of" the Award. Id. (citing Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509-10 (2001)). IBC's request to disturb the Award — either with a vacatur or a remand — faced a steep slope to begin with, and it has provided no argument strong enough to get it to the summit. And so, we affirm.

Costs to Appellee.